[Crim. No. 18447. In Bank. Aug. 26, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK JOHN ANTICK, Defendant and Appellant.

**COUNSEL**

Frank John Antick, in pro. per., Benjamin R. Winslow, under appointment by the Supreme Court, Roger J. Broderick, under appointment by the Court of Appeal, and Dale W. Johnson for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and A. Wells Petersen, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SULLIVAN, J.**—Defendant Frank John Antick was charged by an amended information (hereafter information) with burglary (Pen. Code, § 459)[1] (count I), grand theft (§ 487) (count II), assault with a deadly weapon upon a peace officer (§ 245, subd. (b)) (count III), murder (§ 187) (count IV), and two prior felony convictions.[2] With respect to counts I and II, it was alleged that at the time of the commission of said offenses, defendant was armed with a deadly weapon within the meaning of section 12022.[3] He pleaded not guilty and admitted the prior convictions. A jury found defendant guilty as charged and determined (§ 1157) that the burglary and the murder were of the first degree. (§ 460, subd. 1; § 189.) As to each count, defendant was sentenced to state prison for the term prescribed by law, such sentences to run consecutively with each other. The court further determined that section 3024, subdivision (d),[4] was applicable and made defendant's minimum term in state prison 10 years. Defendant appeals from the judgment.

---

[1]Hereafter, unless otherwise indicated, all section references are to the Penal Code.

[2]Count IV was added by the amended information.

[3]It was also alleged with respect to counts I and II that Donald Joseph Bose, a co-participant with defendant in the charged unlawful activities, was armed with a deadly weapon at the time of the commission of said offenses.

[4]Section 3024 provides in pertinent part: "The following shall be the minimum term of sentence and imprisonment in certain cases, notwithstanding any other provisions of this code, or any provision of law specifying a lesser sentence:

" . . . . . . . . . . . . .

"(d) For a person convicted at one trial of more than one felony, and upon whom are imposed cumulative or consecutive sentences the aggregate of the minimum terms of which exceed 10 years, 10 years."

On September 28, 1973, between 7 and 10 p.m., property having a value in excess of $200 was taken from the Valentine residence in Upland, San Bernardino County. This property included an adding machine, a typewriter, a check writer, a two-speaker stereo and a Spanish style television set.[5] The Valentines, who were not at home at the time, were unable to furnish a description of the burglar.

About 9 p.m. on the same evening Officers Smeaton and Petronzio of the Upland Police Department, on patrol in a marked police vehicle, noticed a Cadillac automobile in traffic with furniture or a stereo in the back seat and furniture in the trunk, whose lid was open and blocking the rear view mirror. The officers saw two people in the car; both driver and passenger appeared to be white male adults. At trial neither officer could identify defendant as an occupant of the vehicle.

After losing sight of the Cadillac for a short time in the traffic, the officers came upon it in a parked position with its motor turned off. Officer Smeaton approached the driver's side of the vehicle while Officer Petronzio stationed himself near the front of the police car. Only the driver, Donald Bose, was in the Cadillac; but Smeaton saw another person about 30 feet away approaching a nearby house. At trial the officer described the person as a white male, about 5 feet 10 inches tall, 145 pounds, with dark brown collar length hair.[6] He could not identify defendant as the individual he had seen. Officer Petronzio did not notice anyone in the general vicinity.

When questioned by Officer Smeaton, Bose gave evasive answers and made a furtive movement, apparently stuffing something underneath his leg. The officer ordered him out of the vehicle and to the front of the police car so as to frisk him. Seeing a revolver and holster on the front seat of the Cadillac and drawing his own gun, Officer Smeaton ordered Bose to put his hands on the hood of the police car. At this point the officer saw the other suspect approaching the Cadillac. Bose then pulled another gun from his waist and fired at Smeaton. The officer returned the fire and Bose started running. Petronzio ordered him to stop and when he failed to do so fired again. Bose staggered and fell. He later died of the bullet wound.

---

[5]The television set was quite large, and Mrs. Valentine testified that it was too heavy for one person to carry.

[6]At the time of his arrest defendant was 47 years old, 5 feet 9 inches tall, weighed 165 pounds, and had short gray hair, long sideburns and a noticeable handlebar mustache.

A search of the Cadillac revealed the television set and other personal property that had been taken from the Valentine home. A green sweater and a set of car keys were also found in the car.

In the early morning hours of September 29, 1973, investigating officers went to Bose's home in Banning. They informed Bose's mother that her son had been killed in the shoot-out and that they were looking for defendant, whose Mustang was parked outside the Bose home and matched the car keys found in the Cadillac. Bose's mother told them that defendant had been living there for several months but that she did not know where he was.

Later that morning, defendant, learning of these developments, took Bose's other car from a neighborhood garage, drove to Bose's residence, removed most of his belongings, and proceeded to his father's home in San Pedro. He was arrested in San Pedro a few days later.

There was evidence at the trial that defendant had lived in Bose's home for several months and that during this period neither man was regularly employed. Neighbors testified that the pair were frequently together and that they came home late at night or in the early hours of the morning. Bose's mother testified that on September 28 both men left in the Cadillac about 4:30 p.m., at which time defendant was carrying the green sweater later found in the car.

Detective Wulf of the Upland Police Department testified that certain statements volunteered by defendant after his arrest were inaccurate. Defendant allegedly had told Wulf that he had last seen Bose at 4:30 p.m. on September 28 when the latter was leaving by himself in the Cadillac. He also stated that on the night in question he had hitchhiked to Cucamonga to get a "fix" of heroin from a contact known to him only as "Juan." At first denying that he had returned to Banning on the following morning, defendant finally admitted that he had arrived there at 5 a.m. on September 29 and picked up Bose's other car at the garage. He neglected to mention his subsequent activities, including his return to Bose's home and his removal of his belongings.

Over defense objection, Wulf also testified that various items of personal property recovered from defendant's room at the Bose residence and from defendant's person after his arrest had been identified as stolen property. The owner of this property stated that his home had been burglarized on September 8, 1973, and confirmed that the items in

question were among those which had been taken. He was unable to identify either defendant or Bose as a perpetrator of the burglary. These items were admitted into evidence without further objection.

Defendant presented an alibi defense. He admitted that on September 28 he and Bose had left the latter's home in the late afternoon. However, he claimed that they had parted company about 6 or 7 p.m., after Bose had refused to assist him in looking for some heroin. According to his testimony, defendant then hitchhiked to Cucamonga and, unable to obtain any heroin hitchhiked back to Banning, where he arrived about 8:30 or 9 a.m. on September 29. Learning from Bose's mother what had happened and apprehensive because of past experience with the authorities, he removed his belongings from the Bose house and in Bose's car drove to his father's home in San Pedro.

Defendant denied that he had participated in the charged or any other burglary. He testified that he did not own the green sweater found in Bose's car and neither wore, nor carried it with him on September 28. While admitting that the car keys were his, he stated that he had placed them in the Cadillac on September 28 but had neglected to take them with him when he left Bose later that evening. He claimed that the items of stolen property found in his room and on his person were gifts from Bose. He also claimed that his prior statements to police authorities regarding his activities on September 28 were consistent with his trial testimony.

Explaining his relationship with Bose, he testified that they had known each other for two and one-half years when Bose bought the Banning residence. The home needed landscaping and repairs and defendant agreed to do this work in exchange for room, board and a small salary, ranging from $50 to $200 per month. During the six-month period in which he lived with Bose, he also spent part of his time at his father's home in San Pedro. While on occasion he and Bose went out together socially, for the most part they led independent lives. Under cross-examination, defendant admitted two prior forgery convictions.

Defendant contends: (1) that his conviction on the murder charge was erroneous as a matter of law; (2) that the court committed error in admitting evidence of a prior offense of burglary and of two prior convictions of forgery; (3) that the evidence is insufficient to support any of the verdicts; and (4) that the court erred in various respects in imposing sentence.

## 1. *The murder conviction.*

Count IV of the information charged defendant with murder in that on September 28, 1973, "during the perpetration of the burglary alleged in Count I of the information his copartner in the burglary, Donald Joseph Bose, initiated a gun battle which was the direct and unlawful cause of the death of the said Donald Joseph Bose." Count I charged defendant with the burglary of the Valentine residence on the same day. Thus count IV charged defendant with the murder of Bose committed during the burglary of the Valentine house.

On the murder count, the trial court instructed the jury on murder (CALJIC No. 8.10), malice (CALJIC No. 8.11), first degree felony murder (CALJIC No. 8.21) and murder based on the theory of vicarious liability (based on *Taylor* v. *Superior Court* (1970) 3 Cal.3d 578, 582-583 [91 Cal.Rptr. 275, 477 P.2d 131]). We set forth the last two instructions in the margin.[7] Under these instructions, defendant's conviction of first degree murder may have been based upon either of two theories: (1) his participation in the commission of a burglary which resulted in the death of his accomplice, or (2) his vicarious liability for the crimes of his accomplice. Defendant contends that on the present record he cannot be convicted of murder under either theory.

Our consideration of defendant's contention requires us at the start to briefly review the basic principles underlying the crime of murder, the felony-murder doctrine and the theory of accomplice liability. ■ A defendant is not guilty of murder unless he is legally chargeable, either by virtue of his own conduct or that of an accomplice, with the two component elements of the crime: its actus reus, a homicide, and its

---

[7]CALJIC No. 8.21 provides: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission of or attempt to commit the crime of burglary and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the first degree.

"The specific intent to commit a burglary and the commission or attempt to commit such crime must be proved beyond a reasonable doubt."

The instruction based on *Taylor, supra,* provided: "When the accomplice of the defendant, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable response to such act, the defendant is guilty of murder.

"Therefore, if the defendant is guilty of the burglary he is vicariously responsible for any killing attributable to the intentional act of his co-burglar committed with conscious disregard for life and likely to result in death.

"If you find such conduct to be true on the part of a co-burglar of the defendant malice is implied as a matter of law and the defendant is guilty of first degree murder."

mens rea, malice.[8] ■ "Homicide is the killing of a human being by another human being." (Perkins on Criminal Law (2d ed. 1969) Offenses Against the Person, § 1, p. 28; see *People* v. *Gilbert* (1965) 63 Cal.2d 690, 705 [47 Cal.Rptr. 909, 408 P.2d 365]; revd. on other grounds, 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951].) ■ Malice is the state of mind of one who has "an intent to kill or an intent with conscious disregard for life to commit acts likely to kill."[9] (*People* v. *Washington* (1965) 62 Cal.2d 777, 780 [44 Cal.Rptr. 442, 402 P.2d 130].) ■ In addition, "[t]he felony-murder doctrine ascribes malice . . . to the felon who kills in the perpetration of an inherently dangerous felony."[10] *(Id.)*

■ The imputation of malice by application of the felony-murder doctrine has been limited by this court to those cases in which the actual killing is committed by the defendant or his accomplice. (*Taylor* v. *Superior Court, supra,* 3 Cal.3d 578, 582; *People* v. *Gilbert, supra,* 63 Cal.2d 690, 703; *People* v. *Washington, supra,* 62 Cal.2d 777, 781.) "When a killing is not committed by a robber or by his accomplice but by his victim, malice aforethought is not attributable to the robber, for the killing is not committed by him in the perpetration or attempt to perpetrate robbery. It is not enough that the killing was a risk reasonably to be foreseen and that the robbery might therefore be regarded as a proximate cause of the killing. Section 189 requires that the felon or his accomplice *commit the killing, for if he does not, the killing is not committed to perpetrate the felony.* Indeed, in the present case the killing was committed to thwart a felony. To include such killings within section 189 would expand the meaning of the words 'murder . . . which is committed in the perpetration . . . [of] robbery . . .' beyond common understanding." (*People* v. *Washington, supra,* 62 Cal.2d at p. 781.)

However, we have been careful to point out that this limitation upon the felony-murder doctrine does not shield a defendant from criminal liability for murder when the elements of the crime, a homicide plus malice, can be established without resort to this doctrine. Thus, "[w]hen

[8]Section 187 provides in pertinent part: "(a) Murder is the unlawful killing of a human being . . . with malice aforethought."

[9]Section 188 defines "malice" for purposes of murder: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

[10]Under section 189, "[a]ll murder . . . which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree . . . ."

the defendant or his accomplice, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable response to such act, the defendant is guilty of murder. In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life. . . . [T]he victim's self-defensive killing or the police officer's killing in the performance of his duty cannot be considered an independent intervening cause for which the defendant is not liable, for it is a reasonable response to the dilemma thrust upon the victim or the policeman by the intentional act of the defendant or his accomplice." (*People* v. *Gilbert, supra,* 63 Cal.2d at pp. 704-705.) Under these circumstances, "it is unnecessary to imply malice by invoking the felony-murder doctrine." (*People* v. *Washington, supra,* 62 Cal.2d at p. 782; fn. omitted.)

Where a murder committed in this manner is attributable not to the acts of the defendant himself, but rather to the acts of his accomplice, the defendant's vicarious liability for the killing is based upon "the rules defining principals and criminal conspiracies . . . . [For the defendant] [t]o be so guilty, however, the accomplice must cause the death *of another human being* by an act committed in furtherance of the common design." (*People* v. *Gilbert, supra,* 63 Cal.2d at p. 705; italics added.)

The operation of these principles can best be illustrated by the following example. Three persons agree to commit a robbery, and during its commission *one* of them initiates a gun battle in which the victim or a police officer in reasonable response to such act kills *another* of the robbers. Since the immediate cause of death is the act of the victim or the officer, the felony-murder rule is not applicable to convert the killing into a murder. Nevertheless, the robber initiating the gun battle and the third accomplice are guilty of murder. The former commits a homicide, since his conduct is the proximate cause of the death of another human being; the intervening act of the victim or police officer is not an independent superseding cause, eliminating responsibility for the killing. Furthermore, in initiating the shootout the robber acts with malice, having intentionally and with conscious disregard for life engaged in conduct likely to kill. That this malice is directed at someone other than his crime partner who as a proximate result of the robber's acts is eventually killed "does not prevent the killing from constituting the offense of murder . . . [since] the law transfers the felonious intent from the original object of his attempt to the person killed and the homicide so committed is murder." (*People* v. *Leslie* (1964) 224 Cal.App.2d 694,

704 [36 Cal.Rptr. 915]; see also *People* v. *Sears* (1970) 2 Cal.3d 180, 189 [84 Cal.Rptr. 711, 465 P.2d 847].) Since in the posited situation the robber initiating the gun battle is acting in furtherance of the common design of all three participants, the third robber as well may be held vicariously liable for the murder. (*People* v. *Gilbert, supra,* 63 Cal.2d at p. 705.)

On the other hand, neither the felony-murder doctrine nor the theory of vicarious liability may be used to hold a defendant guilty of murder solely because of the acts of an accomplice, if the accomplice himself could not have been found guilty of the same offense for such conduct. In *People* v. *Ferlin* (1928) 203 Cal. 587 [265 P. 230], the defendant was charged with and convicted of the murder of one Skala, whom he had hired to burn insured property. Skala accidentally killed himself while perpetrating the arson and the defendant was charged with arson, destruction of insured property, and murder upon a theory of felony murder. In holding as a matter of law that the crime of murder had not been established under any theory of the evidence, this court stated: "It would not be seriously contended that one accidentally killing himself while engaged in the commission of a felony was guilty of murder. If the defendant herein is guilty of murder because of the accidental killing of his co-conspirator then it must follow that Skala was also guilty of murder, and if he had recovered from his burns that he would have been guilty of an attempt to commit murder. . . . [¶] It cannot be said from the record in the instant case that defendant and deceased had a common design that deceased should accidentally kill himself. Such an event was not in furtherance of the conspiracy, but entirely opposed to it." (*Id.,* at pp. 596-597.)

The *Ferlin* holding was aptly explained by the Court of Appeal in *Woodruff* v. *Superior Court* (1965) 237 Cal.App.2d 749 [47 Cal.Rptr. 291]: "We believe the rationale of that decision to be that section 189 was inapplicable because there was no killing by the accused felon and no killing of another by one for whose conduct the accused was vicariously responsible. . . . [¶] . . . [I]n *Ferlin* 'the coconspirator killed himself while he alone was perpetrating the felony he conspired to commit' and 'it was held in substance and effect that inasmuch as [deceased] killed himself Ferlin could not be held criminally responsible for his death,' " (*Id.,* at p. 751.)

Similar reasoning compelled our recent decision in *People* v. *Taylor* (1974) 12 Cal.3d 686 [117 Cal.Rptr. 70, 527 P.2d 622]. There Taylor was

convicted of the murder of his accomplice Smith who was shot and killed by the victims during a robbery at their liquor store. Smith and one Daniels entered the store while Taylor remained in the getaway car. Taylor was found guilty on a theory of vicarious liability for the acts of his confederate Daniels who by threatening the life of one of the victims had provoked in response their return fire which killed Smith. However, Daniels had been separately tried and acquitted of the murder charge. Reversing Taylor's murder conviction but affirming his robbery conviction, we held that the doctrine of collateral estoppel precluded "the conviction of an accused based on his vicarious responsibility for the acts of a previously acquitted confederate." (12 Cal.3d at p. 694.) We reasoned that our decision was essential "to prevent the compromising of the integrity of the judicial system . . . . Few things undermine the layman's faith in the integrity of our legal institutions more than the specter of a system which results in a person being punished for the acts of another, when the actor himself under identical charges had been previously exonerated from responsibility for those very acts. This is particularly so under the facts of the instant case when the People seek to punish defendant, who was not even present on the immediate scene, for the death of an accomplice caused by the acts of another confederate who himself has been exonerated." (*Id.*, at pp. 695-696.)

■ Applying these principles to the case at bench, we first observe that on the uncontradicted evidence defendant himself did not participate in the immediate events which preceded his accomplice's death. Under the People's version of the facts, which we accept as accurate for purposes of this discussion, Bose initiated a gun battle with the police in order to escape apprehension for a burglary which he and defendant had recently committed. The police officer responded by killing Bose. As the immediate cause of death was the act of the officer, it is clear that the felony-murder rule does not operate to convert the killing into a murder for which defendant may be liable by virtue of his participation in the underlying burglary.[11] (*People* v. *Washington, supra,* 62 Cal.2d 777, 781.)

Nor may defendant be held legally accountable for Bose's death based upon his vicarious liability for the crimes of his accomplice. In order to predicate defendant's guilt upon this theory, it is necessary to prove that Bose committed a murder (*People* v. *Taylor, supra,* 12 Cal.3d 686, 697),

---

[11]The People concede in their brief on appeal that the felony-murder instruction was erroneous and that the only possible legal basis for defendant's murder conviction is his vicarious liability for the consequences of Bose's act in initiating the shootout with the police officers.

in other words, that he caused the death of another human being and that he acted with malice. (*People* v. *Gilbert, supra,* 63 Cal.2d at p. 705.)

It is well settled that Bose's conduct in initiating a shootout with police officers may establish the requisite malice. As we have noted on a number of occasions, a person who initiates a gun battle in the course of committing a felony intentionally and with a conscious disregard for life commits an act that is likely to cause death. (*Taylor* v. *Superior Court, supra,* 3 Cal.3d at pp. 582-584; *People* v. *Gilbert, supra,* 63 Cal.2d at pp. 703-704; *People* v. *Washington, supra,* 62 Cal.2d at p. 782.) However, Bose's malicious conduct did not result in the unlawful killing of *another* human being, but rather in Bose's own death. The only homicide which occurred was the justifiable killing of Bose by the police officer. Defendant's criminal liability certainly cannot be predicated upon the actions of the officer. As Bose could not be found guilty of murder in connection with his own death, it is impossible to base defendant's liability for this offense upon his vicarious responsibility for the crime of his accomplice.

In summary defendant's conviction of the murder of his accomplice Bose cannot be upheld either on the doctrine of felony murder or on a theory of vicarious liability. We are therefore compelled to conclude that on the instant record defendant as a matter of law cannot be found guilty of murder and that the verdict of the jury to that effect is against the law and the evidence.

We emphasize that this conclusion is not inconsistent with the core of our decision in *Taylor* v. *Superior Court, supra,* 3 Cal.3d 578 (hereafter *Taylor I*). That case was a predecessor of *People* v. *Taylor, supra,* 12 Cal.3d 686 (hereafter *Taylor II*) and involved the same underlying facts which we previously described. In *Taylor I,* the defendant was seeking a pretrial order setting aside the information charging him with murder on the ground that his conviction was precluded by our decision in *People* v. *Washington, supra,* 62 Cal.2d 777. In declining to grant the relief requested, we simply reaffirmed our position in *Washington* that an accomplice "would be vicariously responsible for any killing attributable to the intentional acts of his associates committed with conscious disregard for life, and likely to result in death," (*Taylor* v. *Superior Court, supra,* 3 Cal.3d at p. 583, fn. omitted) even though the immediate cause of death was the act of a third party. We took the position that the conduct of the defendant's accomplice Daniels which resulted in accomplice Smith's death "was sufficiently provocative of lethal resis-

tance" to support a finding of implied malice. (*Id.,* at p. 584.) Therefore, Daniels could be held criminally responsible for Smith's death, although the actual killing was committed by the resisting victims, and the defendant Taylor could be vicariously liable for Daniels' crimes.

In the case at bench, the situation is quite different. Defendant was convicted of murder based upon his vicarious liability for the acts of an accomplice who could not himself have been guilty of that offense. We note once again that in *Taylor II,* we found that the defendant could not be held legally accountable for Smith's death after Daniels was acquitted of an identical charge. In a like manner, defendant in the instant case may not be held vicariously liable for a crime which his accomplice did not commit.[12]

## 2. *Evidence of other offenses.*

Defendant contends that the trial court committed prejudicial error in admitting over his objection (a) evidence of a prior uncharged burglary for the purpose of identifying defendant as the accomplice of Bose in the charged crimes and (b) evidence of his prior forgery convictions for the purpose of impeaching his credibility. We proceed to consider these contentions in the above order.

---

[12]In *Taylor* v. *Superior Court, supra,* 3 Cal.3d 578, 584, footnote 3, *(Taylor I)* we dealt with this point but in the factual context of that case. There we rejected Taylor's argument that evidence regarding the conduct of Smith (the confederate killed in the robbery) should be ignored on the issue of vicarious liability, since Smith could not have been held responsible for his own death. We indicated that we had rejected a similar contention in *People* v. *Washington, supra,* 62 Cal.2d 777. On the contrary, we had *not* rejected in *Washington* the argument made in *Taylor I.* Rather, in *Washington* we had declined to hold as a general proposition "that surviving felons are not guilty of murder when their accomplices are killed by persons resisting the felony." (62 Cal.2d at p. 780.) We reaffirm this position in the instant case.

We then went on in *Taylor I* to say that if the trier of fact found that Smith set into motion the gun battle resulting in his own death, then Taylor (waiting in the getaway car) could be held vicariously liable for this killing, as well as *any* other killing attributable to his accomplices. Obviously, this last holding is too broad in view of the facts of *Taylor I.* Taylor's responsibility for Smith's death rested entirely on his vicarious liability for the crimes committed by his accomplices. (*Id.,* at p. 582.) Since Smith could incur no criminal liability in connection with his own killing, his conduct which may have contributed to his death did not result in the commission of a criminal homicide. Therefore, his conduct was not relevant to the determination of whether his killing was, in fact, a murder for which his accomplices could be held responsible. Thus, Taylor's vicarious liability for Smith's death had to be based entirely upon Daniels' acts, which could have supported a murder conviction. To the extent that *Taylor I* holds that Smith's conduct which may have contributed to his own death could have been properly considered in assessing Taylor's liability therefor, it is overruled.

### (a) *The prior uncharged burglary.*

Over defense objection, Police Officer Jerry Wulf testified that certain items of personal property recovered from defendant's room at the Bose residence or found on his person at the time of his arrest had been identified as property stolen in a prior burglary in Diamond Bar, California. The burglary victim, called as a witness on behalf of the prosecution, testified that the items in question in fact had been taken from his home on September 8, 1973. The property was admitted into evidence only for a limited purpose and the jury was instructed accordingly.[13] (Evid. Code, § 1101.)

■ Since defendant relied entirely on an alibi defense, the only issue upon which the evidence was arguably relevant was that of identifying him as a perpetrator of the charged burglary and grand theft.[14] (*People* v. *Thornton* (1974) 11 Cal.3d 738, 755 [114 Cal.Rptr. 467, 523 P.2d 267].)

The basic rules governing the admissibility of other-crimes evidence in these circumstances were set forth in detail by this court in *People* v. *Haston* (1968) 69 Cal.2d 233, 244-247 [70 Cal.Rptr. 419, 444 P.2d 91], and need not be repeated here. In *People* v. *Thornton, supra,* 11 Cal.3d 738, we summarized the guiding principles which *Haston* established: "[T]he probative value of such evidence on the issue of identity is dependent upon the extent to which it raises an inference that the perpetrator of the uncharged offense was the perpetrator of the charged offense, and . . . the

---

[13]The trial judge instructed the jury as follows: "Evidence has been received tending to show that the defendant committed [a crime] [crimes] other than that for which he is on trial.

"Such evidence was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes.

"Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:

"1. The identity of the person who committed the crime, if any, of which the defendant is accused;

"3. The existence of the intent which is a necessary element of the crime charged.

"5. That the defendant had knowledge that might have been useful or necessary for the commission of the crime charged;

"6. A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case.

"For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

"You are not permitted to consider such evidence for any other purpose."

[14]A jury determination that defendant participated in the burglary and grand theft was an essential condition precedent to a finding of guilt on all other counts, since his liability with respect to these other charges was based upon his legal responsibility as a co-conspirator or an aider and abettor for the crimes of his accomplice Bose.

determination as to the presence and strength of such an inference proceeds through an evaluation of marks shared by the uncharged and charged crimes. . . . 'It is apparent that the indicated inference does not arise . . . from the mere fact that the charged and uncharged offenses share certain marks of similarity, for it may be that the marks in question are of such common occurrence that they are shared not only by the charged crime and defendant's prior offenses, but also by numerous other crimes committed by persons other than defendant. On the other hand, the inference need not depend upon one or more unique or nearly unique features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together. Thus it may be said that the inference of identity arises when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses.' . . . [B]ecause the probative value of other-crimes evidence on the issue of identity depends wholly upon the strength of the inference, and because the prejudicial effect of such evidence is always manifest, the court's discretion should be exercised in favor of exclusion if the inference of identity is weak. . . .

"To recapitulate, only common marks having some degree of distinctiveness tend to raise an inference of identity and thereby invest other-crimes evidence with probative value. The strength of the inference in any case depends upon two factors: (1) the *degree of distinctiveness* of individual shared marks, and (2) the *number* of minimally distinctive shared marks." (*Id.,* at p. 756.)

Examining the facts of the instant case in light of these considerations, we conclude that the evidence of the Diamond Bar burglary should have been excluded. We are unable to discern any distinctive common marks shared by the charged and uncharged crimes, which would justify the admission of such evidence to prove identity. The fact that both offenses involved the removal of personal property from a private residence during the owner's absence cannot seriously be asserted as a distinctive and signature-like feature setting "the charged and uncharged offenses apart from other crimes of the same general variety . . . ." (*People* v. *Haston, supra,* 69 Cal.2d at p. 246.) Nor was any evidence introduced to prove that the uncharged offense was committed by defendant and Bose

in concert, so as to indicate that the two were crime partners in a series of burglaries. (See, e.g., *People* v. *Haston, supra,* 69 Cal.2d at p. 250.) In short, the evidence presented failed to raise any "logical inference that the perpetrators of the [Diamond Bar burglary] . . . were the perpetrators of the charged offenses. . . . 'If admission of proof of other crimes were to be hinged upon a showing of methods common to most or many . . . [burglary] practitioners, then application of the inclusionary rule would be so broad as to nullify the principle that a defendant is not to be convicted because the prosecution can prove, on his prior (or subsequent) record, that he is a bad man. Assertion of the principle of exclusion as a preliminary to its avoidance becomes mere pretense.' " (*Id.,* at p. 248.)

The People do not attempt to justify the admission of this evidence under the established rules heretofore discussed. Rather, they assert that defense counsel failed to object at trial to the testimony of the victim of the prior burglary and therefore may not raise such objection on appeal. (Evid. Code, § 353, subd. (a); *People* v. *Pearson* (1969) 70 Cal.2d 218, 222 [74 Cal.Rptr. 281, 449 P.2d 217].)

Our independent review of the record, however, reveals that defense counsel *did* object to the introduction of evidence relating to the Diamond Bar incident when the prosecution first offered it through the testimony of Officer Wulf. Indeed, cognizant of the potential prejudicial effect of this line of proof upon the interests of his client, counsel made sure that the arguments on its admissibility were held out of the presence of the jury. During this discussion, the prosecutor specifically stated that he intended to call the burglary victim as a witness on behalf of the People. Defense counsel thereafter reasserted his objection, which was overruled by the court. Once having had this issue resolved against him, defense counsel was not required to repeat his objection when the burglary victim actually testified and when the items of property were admitted into evidence. (See Witkin, Cal. Evidence (2d ed. 1966) Introduction of Evidence at Trial, § 1294, pp. 1197-1198.) ■ It has long been the rule that "[w]here a party has once formally taken exception to a certain line or character of evidence, he is not required to renew the objection at each recurrence thereafter of the objectionable matter arising at each examination of other witnesses; and his silence will not debar him from having the exception reviewed." (*Green* v. *Southern Pac. Co.* (1898) 122 Cal. 563, 565 [55 P. 577].)

### (b) *The prior forgery convictions.*

In the course of cross-examining defendant, the prosecution, over defense objection,[15] questioned him regarding two prior forgery convictions which he had suffered in 1955 and 1957. The jury was instructed to consider this evidence only for the purpose of determining defendant's credibility as a witness.[16] Defendant contends that the trial court abused its discretion in permitting use of this evidence for impeachment purposes, arguing that its probative value was substantially outweighed by its prejudicial effect upon the minds of the jurors. We agree.

As a general rule, evidence of specific instances of a person's conduct is inadmissible to prove that on a particular occasion he acted in conformity with the trait of character indicated by his prior specific acts. (Evid. Code, §§ 1101, subd. (a), 787.)[17] Thus, such evidence may not generally be introduced as proof of a witness' character for honesty or veracity, or their opposites, for the purpose of supporting or attacking the witness' credibility. (Evid. Code, § 787.) Evidence Code section 788, however, creates an exception to this general rule and authorizes the use of prior felony convictions for impeachment purposes.[18]

[15]Defense objection to the use of this evidence for impeachment purposes was made during pretrial proceedings at which defendant admitted the priors for sentencing purposes in order to prevent them from being read to the jury as part of the information.

[16]The trial judge instructed the jury as follows: "The fact that a witness had been convicted of a felony, if such be a fact, may be considered by you only for the purpose of determining the credibility of that witness. The fact of such a conviction does not necessarily destroy or impair the witness' credibility. It is one of the circumstances that you may take into consideration in weighing the testimony of such a witness."

[17]Section 1101 provides: "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

Section 787 states a similar rule governing the use of such evidence for impeachment purposes: "Subject to Section 788, evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness."

[18]Section 788 provides: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony unless:

"(a) A pardon based on his innocence has been granted to the witness by the jurisdiction in which he was convicted.

"(b) A certificate of rehabilitation and pardon has been granted to the witness under

In *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], this court determined that section 788 does not embody a mandatory rule, requiring the trial judge to permit the use of such impeachment evidence in every case. (*Id.,* at p. 452.) Rather, we interpreted the permissive language of the statute to mean that the introduction of evidence of a prior conviction, like the introduction of other relevant evidence, is subject to the exclusionary rule embodied in section 352. (*Id.,* at p. 453.) This provision invests the trial judge with broad discretion to reject evidence otherwise admissible "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

In *Beagle* we also recognized that the use of prior felony convictions to impeach the credibility of a witness is particularly susceptible of exclusion under Evidence Code section 352 where the witness is also the defendant in a criminal case. (*Id.,* at p. 453.) Such circumstances present a unique risk of undue prejudice and confusion of issues. Despite limiting instructions, the jury is likely to consider this evidence for the improper purpose of determining whether the accused is the type of person who would engage in criminal activity. This is particularly likely where the prior conviction is for the same crime as that which forms the basis of the charges against defendant. (*Id.,* at p. 453.) The probability of such misuse also increases where the prosecution's case is weak. (Jefferson, Cal. Evidence Benchbook (1972) Special Problems Related to Relevancy, § 22.2, p. 297.) In these circumstances, only the most disciplined minds would be able to restrict their use of the prior felony evidence to assessing the defendant's credibility as a witness and disregard its obvious implications with respect to his tendencies in the area of unlawful conduct.

In addition to the problems of confusion of issues and undue prejudice inherent in the evidence itself is the possibility that the accused will refuse to testify in order to keep this information from the jury. " 'Even though a judge might find that the prior convictions are relevant to

---

the provisions of Chapter 3.5 (commencing with Section 4852.01) of Title 6 of Part 3 of the Penal Code.

"(c) The accusatory pleading against the witness has been dismissed under the provisions of Penal Code Section 1203.4, but this exception does not apply to any criminal trial where the witness is being prosecuted for a subsequent offense.

"(d) The conviction was under the laws of another jurisdiction and the witness has been relieved of the penalties and disabilities arising from the conviction pursuant to a procedure substantially equivalent to that referred to in subdivision (b) or (c)."

credibility and the risk of prejudice to the defendant does not warrant their exclusion, he may nevertheless conclude that it is more important that the jury have the benefit of the defendant's version of the case than to have the defendant remain silent out of fear of impeachment.'" (*People* v. *Beagle, supra,* 6 Cal.3d at p. 453.)

Balanced against these factors is the probative value of such evidence in discrediting the accused's character for honesty and veracity. In determining probative value, relevant considerations include the nature of the conviction, that is, whether it rests upon dishonest conduct, and its remoteness in time. A conviction which the defendant suffered many years before, "[e]ven one involving fraud or stealing," is at best very weak evidence that he is perjuring himself at trial. *(Id.)*

As in all other cases where admission of evidence is challenged under Evidence Code section 352, the trial judge had considerable discretion in applying this balancing test to determine whether exclusion is warranted under the particular facts before him. (*Id.,* at p. 454.) However, this discretion is not absolute and must be carefully exercised where an individual's liberty is at stake.

■ In the instant case, we are of the opinion that the trial court abused its discretion in permitting use of defendant's prior forgery convictions for the purpose of impeaching his credibility. The potential risk of prejudice and confusion presented by the introduction of this proof is obvious. The case was clearly a close one, there being no direct evidence linking defendant to the charged offenses. The circumstantial evidence of guilt is far from overwhelming. In this situation, it is highly probable that the jury considered the prior convictions as proof that defendant is the type of person willing to participate in unlawful activity and therefore is likely to have committed the crimes in question. While we do not intimate that the jury intentionally ignored the trial court's instruction limiting use of this evidence to impeachment purposes, we are of the view that under the facts of this case a "[d]iscrimination so subtle is a feat beyond the compass of ordinary minds. . . . It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed." (*Shepard* v. *United States* (1933) 290 U.S. 96, 104 [78 L.Ed. 196, 202, 54 S.Ct. 22]; see also *People* v. *Collins* (1968) 68 Cal.2d 319, 330-331 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176].)

Balanced against this risk of prejudice and confusion is the probative value of the evidence on the issue of defendant's credibility. The crime

of forgery does "rest on dishonest conduct" and hence "reflects adversely on a man's [veracity] and integrity." (*People* v. *Beagle, supra,* 6 Cal.3d at p. 453.) On the other hand, defendant suffered these convictions in 1955 and 1957; thus they were 19 and 17 years old as of the date of trial. This remoteness detracts significantly from the value of this evidence in impeaching defendant's credibility. We are aware that he has not led a "legally blameless life" from 1959 to the present. (See *People* v. *Beagle, supra,* at p. 453.) It appears that during this period, he has had a number of altercations with law enforcement authorities involving mainly drug-related offenses. However, we find that these problems, at most, enhance only slightly the probative value of the evidence for impeachment purposes. In any event, the potential for prejudice and "the risk of confusion [inherent in its introduction] is so great as to upset the balance of advantage . . . ." (*Shepard* v. *United States, supra,* 290 U.S. at p. 104 [78 L.Ed. at p. 202].)

Therefore, we conclude that the evidence of defendant's prior forgery convictions should have been excluded under section 352, and the trial court's failure to do so constituted an abuse of discretion.

(c) *Prejudicial effect of erroneous admission of evidence.*

As we previously noted, the case against defendant was not a strong one. The trial court's errors exposed the jury to proof of the accused's participation in criminal activity other than the charged offenses. It is highly probable that this evidence significantly influenced the jury's determination of guilt. The testimony regarding the Diamond Bar burglary, in particular, placed " 'inevitable pressure on [the] lay jurors to believe that "if he did it before he probably did so this time." ' " (*People* v. *Beagle, supra,* 6 Cal.3d at p. 453.) After an examination of the entire cause, including the evidence, we are of the opinion that it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the above errors. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Independently of our conclusion (see part 1, *ante*) that defendant's conviction of the murder count must be reversed since it is against the law and the evidence, we conclude that because of the foregoing prejudicial error the judgment of conviction must be reversed as to all counts.

In view of the foregoing conclusion, we deem it unnecessary to consider the remaining claims of error raised by defendant.

The judgment is reversed.

Wright, C. J., Tobriner, J., and Mosk, J., concurred.

**RICHARDSON, J.**—I concur in the majority opinion to the extent that it reverses defendant's murder conviction, and in its further determination that evidence of the prior uncharged burglary was improperly introduced at trial, since such evidence bore insufficient relevance to the crimes with which defendant was charged.

I do not concur, however, in the majority's conclusion that the trial judge abused his discretion in admitting the prior forgery convictions. Evidence Code section 788 on its face, and without restriction, permits the introduction of such prior convictions. In *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1] we recognized the broad discretion vested in a trial court to admit or exclude such evidence in an appropriate case. In *Beagle* we said, "We do not purport to establish rigid standards to govern that which in each instance must depend upon the sound exercise of judicial discretion." (*Id.,* at p. 453.) More significantly, and in amplification, we explained that "No witness *including a defendant who elects to testify in his own behalf* is entitled to a false aura of veracity. The general rule is that felony convictions bearing on veracity are admissible. . . . [T]here are limits on the use of such [prior conviction] evidence contained within the statutory provisions we have discussed. *A reviewing court, however, should always give careful consideration to an exercise of a trial court's discretion . . . ."* [Italics added.] (*Id.,* at pp. 453-454.)

In the instant case, defendant had suffered two prior convictions for forgery, a crime which necessarily involves an intent to deceive and demonstrates, as the majority concede, the offender's possible lack of veracity. Since these convictions were wholly unrelated to the types of crimes with which defendant was charged, the likelihood that the jury would consider these prior offenses as proof of guilt was minimal, despite the majority's speculation (majority opn., *ante,* p. 98) to the contrary. The jury was carefully admonished to limit its consideration of the evidence to the issue of defendant's veracity, and the prosecutor's reference to these prior convictions was commendably restrained. In a trial which consumed 523 pages of reporter's transcript, reference to defendant's priors consisted of this brief colloquy:

"Q: Have you ever been convicted of a felony, Mr. Antick?

"A: Yes.

"Q: How many times?

"A: Twice.

"Q: What were the charges?

"A: Forgery.

"Q: Both of them?

"A: Yes.

"Q: That was in Los Angeles County?

"A: Yes."

While the fact that the two forgery convictions were old is a factor "of no small importance," this has particular significance if in the interim defendant has led a "legally blameless life," which latter circumstance the majority confirm does not characterize the defendant before us.

On balance, I would conclude that the trial judge's action in admitting the foregoing evidence was well within the ambit of his sound discretion. I further conclude that, in any event, it is quite unlikely that the prosecutor's brief reference to these prior forgery convictions could have persuaded the jury that defendant was guilty of the wholly unrelated crimes with which he was charged.

McComb, J., and Clark, J., concurred.

Respondent's petition for a rehearing was denied October 23, 1975. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.