[Crim. No. 33237. Second Dist., Div. Five. Sept. 25, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD WILLIAM FULKS, JR., et al.,
Defendants and Appellants.

## COUNSEL

Herbert F. Blanck, Anthony J. Despol and Norman W. de Carteret, under appointments by the Court of Appeal, and Robert Knopp, Jr., for Defendants and Appellants.

Evelle J. Younger and George Deukmejian, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline, Howard J. Schwab and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—A jury convicted each of three defendants of robbery (Pen. Code, § 211) and found that they were armed with a firearm at the time of the commission of the offense. (Pen. Code, § 12022, subd. (a).) Richard William Fulks, Jr., was sentenced to state prison for a term of five years—the four-year upper term for the robbery plus a one-year enhancement for the armed finding. Gregory Keith Sowell and Michael Wayne Hayes were each sentenced to the California Youth Authority for similar five-year terms. All defendants appeal.

## FACTS

Much of the prosecution case was based on the testimony and prior inconsistent statements of Mark Colasurdo. Colasurdo was working alone in the pay booth at a self-service gas station on Arroyo Parkway in Pasadena during the early morning hours of November 15, 1977. Colasurdo testified that two men approached him wearing "masks," one of which was a blue bandanna worn across the lower part of the face. A third individual stood off to the side. All 3 appeared to be black, around 25 years of age. The man with the blue bandanna pointed a brown .38 caliber pistol at Colasurdo and demanded money. Colasurdo removed some bills—ones, fives and tens—from the cash drawer and slipped them under the door.

Before calling the police, Colasurdo looked out the door and saw that the robbers had apparently left. About 35 to 40 seconds after the money was taken he called the police and reported a robbery "in progress."

Several details of Colasurdo's testimony were inconsistent with statements he had made to the police immediately after the robbery. While Colasurdo denied having made any of the inconsistent statements, the evidence that he did make them consisted of: (1) a tape recording of Colasurdo's phone call to the police, which revealed that he reported that one of the robbers was wearing a brown jacket; (2) testimony that he told a police officer that the pistol was smaller than a .38 caliber and was light gray or silver in color; and (3) testimony that he told an officer that only $1 and $5 bills had been taken in the robbery.[1]

Colasurdo's call to the police was overheard by Pasadena Police Officer Gregory Gray at 3:52 a.m. Gray ran to his police car and within 60 to 90 seconds from the time of the call he was driving down Raymond Street. Near the intersection of Raymond and Green, which was about six blocks from the victimized gas station, a car had stopped at a flashing red light. It was the only vehicle on the street. As Gray drove by, the two occupants of the car watched him. Gray made a U-turn and noticed that the license plate on the rear of the car was bent up so that it could not be read. When Gray turned on his red light, the car began to pull away and a third occupant "popped up" in the back seat.

---

[1] A motive for Colasurdo's repudiation of his earlier statements was suggested by evidence that he was angry at the prosecution because when he failed to show up at the preliminary hearing the district attorney had him arrested.

The car pulled over. Gray and his partner began to walk toward it with guns drawn. When the front seat passenger reached toward the floor, Gray ordered him to put his hands back up. He complied. However, when Gray moved forward again the passenger again moved his hands toward the car floor. When he pulled back again, the passenger door opened and something metallic hit the ground. It was a chrome-plated, small caliber double-action handgun which was loaded and cocked.

The front seat passenger was Sowell. The driver was Fulks, who was wearing a black jacket over a blue jacket. The rear seat passenger was Hayes, who was wearing a brown jacket. On the rear seat, about where Hayes had been sitting, Gray saw 19 quarters. Underneath the rear seat a "wad" of 17 dollar bills and two $5 bills was found.[2] The record does not show that any money was found on defendants' persons. A black, knotted bandanna was also found in the car.

The three suspects were separated and each was advised of his *Miranda* rights. After waiving his rights, Sowell was asked about the gun. He responded, "What gun?" When asked about the other two people in the car, Sowell identified them as Richard Fulks and Michael Hayes. He explained that he had been riding around in Hollywood and Los Angeles "with others" for several hours and had just returned to Pasadena when he was arrested.

Fulks also waived his rights. He said that before the arrest he had been driving down Raymond Avenue and "had picked up two hitchhikers...who were arrested with him."

Hayes initially refused to speak to the officers. Later that day, however, he was again informed of his rights and waived them. Hayes said that he had left his house at about 2 or 2:30 a.m. to go to a dairy on Arroyo Parkway. The dairy was closed and while he was returning home he was arrested. There is a dairy on Arroyo Parkway next to the gas station which was robbed.

---

[2] It is not clear from the record precisely how much money was taken in the robbery. Colasurdo testified that he did not know the amount; however, during the manager's inventory of the money, Colasurdo had taken about $2 out of the cash drawer to buy doughnuts and coffee. The manager of the station determined from the inventory that $39 was missing. An official of the gasoline company testified that his records showed that $39.52 was taken.

While defendants were being held under arrest on Raymond Avenue, an officer brought Mark Colasurdo to the location to see if he could identify the robbers. Colasurdo would not or could not do so.[3]

None of the defendants testified.

More facts will be added where pertinent.

## DISCUSSION

1. *Admissibility of Defendants' Extrajudicial Statements at the Joint Trial.*

As noted above, shortly after the defendants were arrested they were separated and each made a statement to the police. Although all of the statements were exculpatory, each provided a different explanation of the defendants' activities immediately preceding the arrest.[4] The prosecution sought the admission of all three statements on the theory that the conflicting stories demonstrated a consciousness of guilt on the part of each of the defendants.

All counsel objected, arguing that either the statements should not be admitted or the trials should be severed under *People* v. *Aranda* (1965)

---

[3]Colasurdo testified that he had told the officer, "They're not the guys." The officer denied that Colasurdo had said that and that "the substance of his exact words" was that he "could not positively identify any of the three individuals."

[4]Counsel set forth for the record the following statements, as taken from the police reports:

Sowell denied participation in the robbery. He stated that Fulks had taken himself and Hayes to Hollywood, where the three got high. They were on their way home when they were stopped by the police. Sowell said that Fulks had tossed the gun from the car because he did not "want to get busted with it." Sowell claimed that the money in the back seat had been given to Hayes by Hayes' girl friend. Sowell identified his companions as "Richard Fulks" and "Michael Hayes." When asked about the gun, he said, "What gun?"

Fulks told the police that he was driving alone. After he left the Pasadena freeway, he saw "two individuals who were running and...they flagged him down and asked for a ride and...he picked them up." When he began to slow down for the police officers, the person in the back seat had said, "Keep going; don't stop."

Hayes' story was that Fulks and Sowell had come to his house at about midnight. They talked until about 2 or 2:30 a.m. and then left to go to the store to buy some milk for his sick baby. Since they could not find an open store, they went to a dairy near the gas station that had been robbed. They were stopped by the police after they left the location of the dairy. He denied any knowledge of the money in the back seat, the gun, or the robbery.

63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].[5] The court determined that the following edited versions of the defendants' statements were admissible: (1) *Sowell*: when asked if he knew the two people who were in the car with him when he was arrested, Sowell answered that he did and said, without hesitation, that their names were Richard Fulks and Michael Hayes. In response to a question about the gun, he said, "What gun?" He was then asked what he was doing from late the previous evening to the time he was arrested; he replied that he "was riding around with others in Hollywood and Los Angeles before returning to Pasadena when he was arrested." (2) *Fulks*: When asked where he was before his arrest, Fulks—the driver of the car—stated that "he was driving the car and picked up two hitchhikers on Raymond Avenue in Pasadena who were arrested with him." (3) *Hayes*: In response to a question concerning his whereabouts on November 15, 1977, Hayes answered that he had left his house at about "2:00 or 2:30 a.m. [and] went to a dairy on Arroyo Parkway which was closed, and on returning he was arrested."

As edited, the statements did not necessarily conflict. However, to reconcile them one would have to imagine an improbable scenario in which Sowell, after riding "with others" through Hollywood, and Hayes, having just visited a dairy, were hitchhiking in Pasadena at about 4 a.m., were picked up by Fulks, at which time introductions were made all around. This improbability was not lost on the prosecutor, who later argued to the jury that it would take "some magic" on the part of the defense to "reconcile the fact that one picked up two hitchhikers at the same time, one is going to the dairy and at the same time they are just driving around Hollywood and Los Angeles.... [A]ll three statements aren't the truth...because [the defendants] are thinking of three different stories to explain their presence."

[5]The motions for severance were initially made before Judge Rogan, who at first ruled that "[i]t would appear that if the People wish to introduce some statements, that some severance would be required." Judge Rogan then noted that the case was to be transferred to Judge Fletcher, who would not be bound by her ruling "if the People choose not to introduce statements or to edit them." In Judge Fletcher's court, the People moved for the introduction of edited versions of the statements. Defense counsel urged that no amount of editing could purge the statements of improper inculpatory references. Judge Fletcher ruled that he would permit the edited statements to be used because he did not "know of any case that has carried [*Aranda*] so far as to say that the statements must be cleaned up to the effect that the circumstances without reference to the statements themselves inculpate the defendants." All three defense counsel entered "continuous objections" to the statements. Although no further objections on *Aranda* grounds were made when the statements were introduced, the earlier objections were sufficient to preserve the point for appeal. (*People v. Antick* (1975) 15 Cal.3d 79, 95 [123 Cal.Rptr. 475, 539 P.2d 43].)

The court instructed the jury that Sowell's and Hayes' statements were to be considered only in relation to the declarants; apparently by oversight, no such admonition was given with regard to Fulks' statement.

■ Defendants argue that even with the deletions and limiting instructions, the admission of their various extrajudicial statements was error under *People v. Aranda, supra,* and *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]. In *Aranda,* the California Supreme Court sought to accommodate the legislative preference for joint trials (Pen. Code, § 1098) to the fact that the prosecution frequently wishes to present evidence in the form of incriminating statements admissible only against one defendant which, however, incriminate codefendants against whom the statements are inadmissible. The court announced that rather than pursuing the constitutionally doubtful procedure of instructing the jury that such statements can be used only against the declarant defendant, the trial court must delete any portion of the statement "that could be employed against nondeclarant codefendants"; if effective deletions cannot be made, the trial court must either grant a severance or exclude the statements in their entirety. (*People v. Aranda, supra,* 63 Cal.2d at pp. 529-531.) The constitutional significance of the problem was explained in *Bruton,* in which the United States Supreme Court held that, at least where the declarant defendant does not testify, the admission of that defendant's statements which incriminate a codefendant violates the codefendant's Sixth Amendment right of confrontation, notwithstanding limiting instructions to the jury.

Although the most common circumstance in which *Aranda-Bruton* principles are brought into play is that the codefendant is identified in the declarant defendant's statement as a coparticipant in the crime (see, e.g., *People v. Hill* (1967) 66 Cal.2d 536, 557 [58 Cal.Rptr. 340, 426 P.2d 908]; *People v. Atkins* (1975) 53 Cal.App.3d 348, 356-357 [125 Cal.Rptr. 855]), *Aranda* makes it clear that the problem remains when the statements are "not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established." (*People v. Aranda, supra,* 63 Cal.2d at p. 530.) Thus *Aranda-Bruton* error has been found where the codefendant is incriminated by implication when the statements are viewed with the rest of the evidence, although the statements do not identify the codefendant in any way.

(*People* v. *Smith* (1970) 4 Cal.App.3d 41, 50 [84 Cal.Rptr. 229]; *People* v. *Romero* (1967) 251 Cal.App.2d 986, 990 [60 Cal.Rptr. 188].)

In the present case, when each of the statements is isolated from the others it is entirely exculpatory. However, "statements merely intended to be exculpatory by the defendant are often used . . . to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word. . . ." (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 477 [16 L.Ed.2d 694, 725, 86 S.Ct. 1602, 10 A.L.R.3d 974].) Taken together, and considering the factual context in which they were given, the various statements of the defendants carried the unmistakable message that each was a hastily contrived fabrication. Of course, it was precisely for this cross-incriminating effect that the prosecution sought their joint admission. The trial court recognized the *Aranda-Bruton* implications of the situation and attempted to remedy it by excising all direct references to codefendants and instructing the jury on the limitation on the use of the statements; but since even the edited versions were reconcilable only by laborious flights of imagination, their incriminating effect was hardly dissipated. Nor, as we have seen, did the prosecutor accept the limitations imposed by the court. Thus, if ever there was a case in which it was futile to instruct the jury that it was required to consider each statement only against the declarant, this is it.

The People rely upon *People* v. *Epps* (1973) 34 Cal.App.3d 146, 157 [109 Cal.Rptr. 733], in which the court stated that it is not *Aranda-Bruton* error "to admit in evidence the admission or confession of one defendant, which reflects his commission of a crime that is revealed by the physical evidence, because it might reflect on the issue of whether or not a crime was actually committed by not only the declarant but also by another, whom evidence, other than the confession, links to the declarant's activities." This passage from *Epps* is quite beside the point. Here the statements were not offered for the purpose of being added to otherwise admissible evidence, but for the sole purpose of being improperly played off against each other so as to demonstrate the collective consciousness of guilt of the three defendants. In effect, each of the declarants accused the other two of lying. Since none of the three codefendants testified, none was afforded the constitutionally guaranteed opportunity to confront his accusers.

For these reasons, we conclude that the admission of the extrajudicial statements constituted *Aranda-Bruton* error; consequently, the constitu-

tional standard of harmless error applies. (*Harrington* v. *California* (1969) 395 U.S. 250, 253 [23 L.Ed.2d 284, 287, 89 S.Ct. 1726].) In assessing the prejudice, we first note that the case against defendants was far from overwhelming. The People's evidence—entirely circumstantial—was fraught with problems. The principal prosecution witness was singularly uncooperative and had to be impeached repeatedly with his prior statements. Although Colasurdo's fractiousness could be explained to some extent by a grudge he developed against the prosecution during the later course of the litigation, that fact did not explain his total inability to identify the defendants as the robbers when they were displayed to him a short time after the robbery. Also unexplained was the fact that although about $39 was found to be missing after the robbery, when defendants were stopped within five minutes after the incident they possessed only $31.75.[6]

In light of these weaknesses in the prosecution case, the erroneously admitted statements were vital evidence demonstrating consciousness of guilt. Indeed, the court instructed the jury per CALJIC No. 2.03 that if it found that defendants had made "false or deliberate misleading" extrajudicial statements, it could infer such a consciousness of guilt. Under these circumstances, we cannot say that the error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Although the judgment must be reversed because of the *Aranda-Bruton* error, we will address the additional issues which might arise on retrial.

2.  *Search and Seizure.*

Defendants argue that the search of their car was the result of an unlawful detention not supported by probable cause and that therefore the items seized from the car should have been suppressed. The evidence at the Penal Code section 1538.5 hearing showed that at the time Officer Gray activated the red light on his police car to detain the occupants of the suspects' car, he knew that three black men armed with a gun had robbed a gas station about a minute before. The car was about six blocks from the gas station, parked at a flashing red light. It was the

---

[6]Although the prosecutor insinuated that Colasurdo himself had stolen the balance, there was no evidence to support this theory.

only car on a street which, from his experience with previous robberies at the same gas station, he knew to be an escape route used by robbers. The rear license plate was bent up making it impossible for him to read the numbers. There were two black men in the car, who watched him as he drove by.

■ The facts known to the officer at the time he determined to detain the car and its occupants were certainly sufficient to cause him to suspect that a crime had taken place and that the individuals in the car were connected with it. (See *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].) The car's proximity in time and place to the robbery, the fact that it was the only vehicle on a known escape route, the race of the occupants and their behavior, and, above all, the fact that the rear license plate was obscured from view (see Veh. Code, §§ 5202, 5204) were all legitimate factors which contributed to probable cause to detain.

Of course, the circumstances quickly burgeoned from those justifying a detention to justification for an arrest. As the red light on the police car was activated, a third black man appeared in the rear seat. Moments later, a handgun dropped out of the front door of the stopped car. In addition, once the occupants were out of the car, the officer saw several objects "in plain view" inside the car, including a bandanna, some gloves, and a number of quarters on the back seat. The sum total of the facts known to Officer Gray was adequate to "...lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the [defendants were] guilty of a crime." (*People* v. *Galosco* (1978) 85 Cal.App.3d 456, 461-462 [149 Cal.Rptr. 407].) The arrest of defendants and the search of the car were proper. (*Id.*)

### 3. *Admissibility of Hayes' Statement.*

Hayes asserts that his extrajudicial statement was introduced into evidence in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] as interpreted by our Supreme Court in *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal. Rptr. 817, 441 P.2d 625], and *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108]. ■ *Fioritto* and *Pettingill* hold that once a person in custody has refused to waive his right to re-

main silent, all attempts at police interrogation must cease; later statements obtained by further questioning are inadmissible even if the suspect is readvised of his *Miranda* rights and waives them at that later time, unless the suspect himself initiates the conversation. (*Id.* at p. 241.)

At a hearing outside the presence of the jury, Officer Gray testified that about 45 minutes after defendants had been placed under arrest, Gray advised Hayes of his *Miranda* rights. Hayes said that "he didn't want to say anything."

About eight and one-half hours later, at 1:30 p.m., Pasadena Police Officer Albert Cauchon approached Hayes. He knew from Gray's police report that Hayes had refused to talk after being advised of his rights. Nevertheless, Cauchon again went through the *Miranda* litany, concluding with the question whether Hayes wished to waive those rights and make a statement "regarding this incident." Hayes answered "Yes" and proceeded to tell Cauchon his alibi about the early morning trip to the dairy.

The *Fioritto-Pettingill* doctrine is clearly applicable here. The Attorney General's reliance upon *People* v. *Lopez* (1979) 90 Cal.App.3d 711 [153 Cal.Rptr. 541] is unavailing. Concluding that *Pettingill* did not announce an inflexible rule, the *Lopez* court held on the facts of that case that the defendant's statements were admissible despite Lopez' invocation of his constitutional rights at an earlier interrogation. The court based its decision on a number of factors: the second interrogation was not a continuation of the earlier one and was "totally unrelated" to the offense for which the defendant was arrested, the second advisement of rights was "full, exact, accurate and proper," the officer who initiated the later interrogation was entirely unaware of the fact that the defendant had previously invoked his *Miranda* rights, and the refusal of the defendant to speak in the first instance was "a personality clash between himself and [the first] officer, rather than a sincere desire to exercise his privilege against self-incrimination." (*Id.*, at pp. 719-721.) Aside from the fact that the second advisement in the instant case was apparently complete, none of the ameliorating factors found in *Lopez* are present here. To hold that the *Fioritto-Pettingill* rule could be circumvented solely because the second warnings were formally unobjectionable would eviscerate the rule entirely. The statement should have been suppressed on *Miranda* grounds.

### 4.  *Substantive Use of Prior Inconsistent Statements.*

Fulks and Hayes argue that the admission of Colasurdo's prior inconsistent statements as substantive evidence violated the confrontation clauses of the state and federal Constitutions. Their arguments have been rejected by the state Supreme Court. (*People* v. *Chavez* (1980) 26 Cal.3d 334, 349-351 [161 Cal.Rptr. 762, 605 P.2d 401].)

The judgments of conviction are reversed.

Stephens, J., and Hastings, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 19, 1980.