Filed 12/10/13  P. v. Garrett CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055776 |
| v. | (Super.Ct.No. INF1100845) |
| DARIN LEDALE GARRETT, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  David B. Downing, Judge.  Affirmed as modified.

Farmani, APLC and Tony Faryar Farmani, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Melissa Mandel and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

1

The prosecution presented lengthy and detailed evidence — including DNA evidence — that defendant Darin Ledale Garrett performed various sex acts on the alleged victim, Jaclyn.[1] Jaclyn testified that he committed all of these sex acts by force and without her consent. She was left with bruises and scratches, including scratches on her genitals.

When interviewed by the police, defendant denied having consensual or nonconsensual sex with Jaclyn. After sitting through the prosecution's case, however, he took the stand and testified that the sex acts were (or, at least, seemed to him to be) consensual.

A jury found defendant guilty of:

Count 1: Rape by force or fear (Pen. Code, § 261, subd. (a)(2));

Count 2: Simple battery (Pen. Code, § 242), as a lesser included offense of oral copulation by force or fear (Pen. Code, § 288a, subd. (c)(2));

Count 3: Sexual penetration by force or fear (Pen. Code, § 289, subd. (a)(1);

Count 4: Sexual battery (Pen. Code, § 243.4, subd. (a)); and

Count 5: Rape of an intoxicated person (Pen. Code, § 261, subd. (a)(3));

Count 6: Sexual penetration of an intoxicated person (Pen. Code, § 289, subd. (e)).

---

**1**    The trial court ordered that the alleged victim be referred to solely by her first name.

Defendant was sentenced to 12 years in prison plus 90 days in any penal institution, along with the usual fines, fees, and conditions.

Defendant now contends:

1. The trial court erred by admitting the victim's hearsay statements to a sexual assault nurse examiner.

2. The trial court erred by admitting the victim's hearsay statements to a police officer.

3. The trial court erred by allowing the prosecution to amend the information so as to add charges of rape of an intoxicated person and sexual penetration of an intoxicated person.

4. Defendant could not be convicted of both sexual battery and forcible sexual penetration.

5. The trial court erred by finding that count 1 (forcible rape) and count 3 (forcible sexual penetration) were committed on the separate occasions, and thus by imposing full-term consecutive sentences on these counts.

We conclude that, regardless of whether the prosecution properly amended the complaint, defendant could not be convicted of either rape of an intoxicated person or sexual penetration of an intoxicated person for other reasons. Accordingly, we will strike these convictions. Otherwise, we find no prejudicial error. Hence, we will affirm the remainder of the judgment.

# I

## FACTUAL BACKGROUND

On April 30, 2011, Jaclyn, aged 22, attended the Stagecoach Festival in Indio. Her friend Tessa M. drove her and two other friends there. Around 1:00 p.m., the group checked into their hotel, where they drank beer.

Around 3:00 p.m., they arrived at the festival site. Tessa M. parked in Lot 2. Lot 2 was a 23-acre grassy field with room for 2,000 vehicles. There were parking attendants wearing yellow jackets.

Before going in, Jaclyn's group tailgated in the parking lot until about 4:00 p.m.; this involved drinking more beer. Jaclyn had a total of seven or eight beers all day. Once inside the festival, she did not buy any alcohol, although she did have "a taste or two" of her friends' vodka drinks.

Around 8:00 or 8:30 p.m., Jaclyn and Tessa M. went to use the port-a-potties. When Jaclyn was done, she could not find Tessa M..[2] She phoned Tessa M.; she got through, but it was too loud to hear what Tessa M. was saying. Then the call was dropped. Jaclyn tried to call Tessa M. back, but her phone's battery died.

Jaclyn tried to go back to the place where they had been sitting but could not find it. Because the festival was almost over, she decided to go back to Tessa M.'s car and

---

[2] Tessa M. testified that Jaclyn went to the restroom alone.

4

wait there. She was still feeling "buzz[ed]." After walking for 30 to 45 minutes, Jaclyn reached Lot 2. Next, she located the row the car was parked in.

At that point, defendant walked up to her. He was working at the event as a parking attendant; he was wearing a yellow jacket. He asked if she needed help finding her car. She said, "No, thank you." Defendant insisted, however, saying, "Oh, it's no big deal. I'll walk with you. It's fine." He seemed friendly and polite. She felt safe with him because, based on his yellow jacket, she thought he was a security officer.

Jaclyn asked to borrow his cell phone. When he handed it to her, she noticed that his wallpaper was a photo of himself. She called Tessa M. and said that she was in the parking lot and going back to the car. The call was dropped before she heard Tessa M.'s reply. According to cell phone records, this call was placed at 9:47 p.m.

When they found the car, its front end was behind an SUV, and its rear end was abutting a driving lane. Jaclyn sat on the grass at the rear of the car. Defendant asked, "[H]ow are you going to thank me?" She took this as a joke; she said thank you. He suggested that it would be easier for her friends to find her if she sat at the front of the car. She did not think this made sense, but she did think it would make her less likely to get hit by a car, so she complied.

As she sat down at the front of the car, she realized that defendant was exposing himself. She was "shocked and kind of scared." She told him to go away, that she had a boyfriend and was not interested. However, as she was talking, he moved closer to her,

5

put his hand on her shoulder, and forced her head forward, so that his penis went into her mouth. She turned her head away, so it was in her mouth only for a second.

Again, she told him to go away. Defendant then put his hands on Jaclyn's shoulders and pushed her back and onto the ground. He pulled down her tank top and bra, exposing her right breast. Lying on top of her, he started to suck and bite her nipple. She started to cry; she told him to stop, and she kept trying to push him away. He kept saying, "It's fine. It's fine."

Defendant put one hand down her shorts and "jamm[ed]" his fingers into her vagina. Next, he undid the belt, button, and zipper of her shorts and pulled the shorts down. He then put his penis in her vagina. Jaclyn started yelling "really loud." When she heard someone coming, defendant got up, fastened his pants, and walked away. Jaclyn did not think he ejaculated, but she was not sure.

Meanwhile, Concetta Staiger and her two daughters were in Lot 2 looking for their car, which just happened to be the SUV parked in front of Tessa M.'s car. As they got near it, they heard a girl crying. Then they saw a black male, wearing a yellow jacket, emerge from the parked vehicles. He was "walking strangely" — "bent over" at the waist and "taking large strides." Staiger was "suspicious" and thought he might have been "stealing things out of people's vehicles."

As they were getting into their car, Staiger's younger daughter said, "Mom, there's somebody behind our car crying." They went to the back of her car and found Jaclyn, lying on the ground and crying. She was fully dressed, but her belt was unfastened.

Staiger asked, "Are you all right?," and Jaclyn replied, "No, I've just been raped." She was "very distraught." Staiger's older daughter called 911. Jaclyn gave Staiger a brief account of the rape, which was consistent with her testimony at trial. The Staigers drove Jaclyn to the entrance of the parking lot to wait for the police.

Meanwhile, Tessa M. was trying to call Jaclyn back on the number that Jaclyn had just called her from. Eventually, a man answered. Tessa M. asked if he was still with Jaclyn; he said, "No, she's not with me," and hung up on her. He was "abrupt" and "curt." According to cell phone records, this call took place at 9:55 p.m. Tessa M. kept calling the number, but no one ever answered again.

After the police arrived, Detective Pat Biggers interviewed Jaclyn. She gave him a somewhat longer statement that was essentially consistent with her testimony at trial.[3]

Starting at 2:30 a.m., Diana Faugno, a trained and highly experienced sexual assault nurse, examined Jaclyn. Jaclyn had several bruises on her legs and buttocks.[4] She had a scratch on her arm and a scratch on her hand. She had a scrape and multiple scratches on and around her labia minora.

Nurse Faugno asked Jaclyn what had happened to her. Jaclyn's statement to Nurse Faugno was consistent with her trial testimony.

---

[3] There were two minor exceptions. First, Jaclyn told Detective Biggers that she had three "mixed drinks" before entering the festival. Second, at trial, she described defendant's phone as a "Blackberry-type," but in her statement to Detective Biggers, she described it as a "flip-phone-type."

[4] Jaclyn admitted that one of these bruises was preexisting and self-inflicted.

7

Defendant's DNA was found on Jaclyn's right breast and upper chest. Sperm cells, with defendant's DNA, were found in Jaclyn's vagina. The quantity of sperm cells was consistent with ejaculation.

The police also interviewed Tessa M., who gave them the call history of her phone. They determined that the number from which Jaclyn had called Tessa M. belonged to defendant, that he was working at the festival as a parking attendant, and that he was staying in a certain hotel room.

Around 7:30 a.m., Detective Biggers located defendant at his hotel room. Defendant showed the officer his cell phone, which had a photo of himself as wallpaper. Defendant said that no one else had used his cell phone the previous night.

The police showed Jaclyn a photo lineup. Initially, she identified someone other than defendant. Next, however, the police showed her defendant's cell phone. She looked at the wallpaper photo and said "that was the person who assaulted her." She then spontaneously stated that she had picked the wrong person in the photo lineup.

The police Mirandized defendant and interviewed him. Defendant denied having any consensual or nonconsensual sex the night before.

Defendant did confirm that he had been working in Lot 2. He also gave his account of the two phone calls. First, a girl wearing shorts, who was "real intoxicated," borrowed his phone. She was "too messed up" to dial, so he dialed the number for her. After speaking to her friend, she handed the phone back to him and "staggered away."

8

Later, he saw her "sitting with her legs crossed by a car." Five or ten minutes later, somebody called him back. Defendant said, "[Y]our friend is in [L]ot [T]wo."

At trial, defendant admitted having sex with Jaclyn. He claimed that he lied to the police because he had never been arrested before and he was scared. On cross-examination, however, he admitted that he had been arrested twice before.

Defendant testified that he let Jaclyn use his cell phone. She asked him to help her find her car, and he agreed. He could tell she was drunk.

While they were walking, defendant said, "You're a very pretty girl." Jaclyn replied, "You're not so bad yourself." After they had been "walking for a while," he asked, "[A]re you a good kisser?" She said, "Wow, you don't want to know that." Defendant said, "Yes, I do want to know." They kissed for about three minutes.[5]

Jaclyn then lay back on the hood of a nearby car, "like, here I am." Defendant "didn't want to go any further," because he knew she was "intoxicated." He "picked her up off the car and said, 'Hey, I'm getting way too far from my area, so I'm going to let you go on from here because you can't tell me what it looks like or what kind of car it is . . . .'" He went back to his work station.[6]

---

[5] On cross, however, defendant testified, "The kiss happened before we started walking."

[6] On cross, however, defendant testified that, after he "pick[ed] her up off that car," they resumed "walking" and "looking for her vehicle."

9

Sometime after that, defendant saw a car leaving; he went to see where it had come from, in case another car arrived and needed a parking space.[7]  As he was walking, he saw Jaclyn sitting cross-legged behind a car, asleep, with her "head down into her lap."  He was afraid she would get run over, so he tapped her on the shoulder and said, "Young lady."  She looked up at him and said, "Huh[?]"  He said, "You should move to the front of the car so you[r] party can see you."  She seemed dazed and just repeated, "Huh[?]"

He told her once again to move to the front of the car; he demonstrated by walking there himself.  She crawled on her hands and knees to where he was standing.  Then she said, out of the blue, "No, I'm not going to suck your dick."  Defendant denied exposing himself.

Defendant asked her for another kiss.  She said she did not want to kiss him.  He said, "Well, let me see your breasts."  She bared one breast; defendant kissed it, then put a "passion mark" on it by sucking it.

Jaclyn lay back and unfastened her belt.  Defendant, taking this as permission, unzipped her shorts; she pulled the shorts down.  Then she lay down and "cocked her legs."  Defendant unzipped his pants and "put [his] penis inside her . . . ."  But "[o]nce I was in her," he testified, "then she changed her mind."  She said, "No, I don't want to."  He got up "immediately."

---

[7]    Defendant admitted, however, that at this point, the festival was almost over and "we wasn't parking any[ ]more cars . . . ."

He asked if he could kiss her again.  According to defendant, "She said I can't give her a kiss, so I start[ed] putting my finger in her."  At that point, however, defendant felt bad because he was not supposed to be "doing that" at work, so he walked away.

Five or ten minutes later, Jaclyn's friend called defendant.  He told her, "Your friend is in Lot 2."  He denied hanging up on her; rather, his phone went dead.

As of 3:00 a.m., Jaclyn had a blood alcohol content (BAC) of 0.11 percent.  This meant that, at 10:00 p.m., she would have had a BAC between either 0.16 to 0.21 percent, according to one defense expert, or 0.21 to 0.23 percent, according to another defense expert.  A person with a BAC between 0.21 and 0.23 percent would likely experience disinhibition, disorientation, difficulty understanding what is going on, memory gaps, and distorted time perception.

## II

## THE ADMISSION OF THE VICTIM'S STATEMENTS TO NURSE FAUGNO

Defendant contends that the trial court erred by admitting the victim's statements to Nurse Faugno under the hearsay exception for statements of mental or physical condition.  (Evid. Code, § 1250.)

A.    *Additional Factual and Procedural Background.*

The prosecution filed a motion in limine to admit the victim's statements to Nurse Faugno.  It explained that Nurse Faugno had asked the victim "a series of questions regarding what happened to her, how she physically felt, and what she remembered."  In response, "[Jaclyn] told Ms. Faugno what she could remember about that night and what

11

[d]efendant did to her . . . ." It argued that the statements were admissible as statements of mental or physical condition under Evidence Code section 1250 and/or as prior consistent statements under Evidence Code section 1236.

In argument on the motion, defense counsel stated, "I don't think there's any meaningful distinction between what she tells the . . . nurse . . . and her statement to the police." He added, "[I]t just seems to be simply hearsay. It's not contemporaneous. We don't typically let the police testify to a statement that they just collected, and that's more contemporaneous than this."

The trial court then ruled: "Under 1250 of the Evidence Code, mental state exception to the hearsay rule would seem to apply. So I'll let you get it in, but, remember, by the time the . . . nurse testifies, the victim has already testified. So you may be opening up something like inconsistent statements . . . . If they're inconsistent, obviously [defense counsel] is going to ask . . . . So that's probably what this will end up being, but on its face, mental state can get in. So I'll allow it."

Nurse Faugno then proceeded to testify to what the victim told her. It was consistent with the victim's testimony at trial: The victim got lost; she was looking for her friend's car when a black security guard offered to help her. When they found the car, he said, "Is that how you're going to thank me?" She went around to the front of the car and ended up on her back on the ground. He was on top of her; she tried to push him off but could not. There was an "act involving his penis and her mouth[.]" "[She] turned [her] head away, and it came out." Defendant pulled down her shirt. He licked her upper

12

chest and right breast and bit her right breast. He took off her belt and pulled down her shorts. He put his fingers in her vagina, then put his penis in her vagina. She was pretty sure he did not ejaculate.

B.  *Analysis*.

1.  *Forfeiture*.

Preliminarily, the People contend that defense counsel forfeited the issue by failing to renew his hearsay objection when Nurse Faugno actually testified.

"[I]f a motion to exclude evidence is made raising a specific objection, directed to a particular, identifiable body of evidence, at the beginning of or during trial at a time when the trial judge can determine the evidentiary question in its appropriate context, the issue is preserved for appeal without the need for a further objection at the time the evidence is sought to be introduced." (*People v. Crittenden* (1994) 9 Cal.4th 83, 127.) On the other hand, "[a] tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself. [Citations.]" (*People v. Holloway* (2004) 33 Cal.4th 96, 133.)

Here, defense counsel objected in limine based on hearsay. This was a specific objection, and it was directed at an identifiable body of evidence — the victim's statements to Nurse Faugno. The trial court ruled unequivocally that this evidence was admissible under Evidence Code section 1250.

13

The only tentative aspect of the trial court's ruling was its speculation that the evidence might also become admissible under the prior inconsistent statement exception (Evid. Code, § 1237).  However, that never actually happened.

By the time Nurse Faugno actually testified, nothing had changed.  The People argue that, when the trial court ruled on the motion in limine, for all it knew, the challenged statements related to the victim's mental and physical condition; it had no way of knowing that the statements also set forth defendant's conduct in the commission of the crimes.  According to the People's own motion, however, the nurse asked the victim "what happened to her" and "what she remembered."  The victim then told the nurse "what she could remember about that night and what [d]efendant did to her . . . ."  Thus, the trial court was made aware of the true scope of the statements.  We conclude that the issue was adequately preserved.

    2.  *Prejudice*.

Defendant argues that the victim's statements were hearsay and not admissible under Evidence Code section 1250.  The People do *not* argue that the evidence *was* admissible under Evidence Code section 1250.  Rather, they argue that the statements were not hearsay because they were relevant and admissible for purposes other than their truth.  The People also argue that the evidence was admissible under the spontaneous statement exception.  (Evid. Code, § 1240.)

We may assume, without deciding, that the trial court erred by admitting the victim's statements to Nurse Faugno. Even if so, as we will discuss, the error was harmless.

Defendant argues that the error was prejudicial under either the federal constitutional standard (*Chapman v. California* (1967) 386 U.S. 18, 24) or the state constitutional standard (*People v. Watson* (1956) 46 Cal.2d 818, 836). However, he does not explain why *Chapman* could or should apply. Accordingly, he has forfeited any such contention. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 ["'[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.]"].) Moreover, at trial, defense counsel did not object on federal constitutional grounds. Thus, the contention has been doubly forfeited. (See *People v. Partida* (2005) 37 Cal.4th 428, 435.)

If only out of an excess of caution, we note that, even if the evidence was inadmissible hearsay, its admission did not violate the federal constitution. It did not violate the confrontation clause, because Jaclyn appeared at trial and could be cross-examined about the statements. (See *Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9 ["[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."].) Moreover, it did not violate due process. Precisely because we ultimately find the error harmless under state-law standards, it follows that it did not render the trial fundamentally

15

unfair.  (See *People v. Bonilla* (2007) 41 Cal.4th 313, 355; *People v. Partida*, *supra*, 37 Cal.4th at p. 439.)

Accordingly, we apply the state constitutional error standard, which asks whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

Nurse Faugno did not go into detail regarding the victim's statements.  Her testimony on this subject takes up a total of about four transcript pages.  The bulk of the statements described the sexual acts — Jaclyn described an "act involving his penis and her mouth," she described an act of "digital penetration," she described an act of licking and biting her breast, and she described an act of sexual intercourse.  All of these statements were harmless because defendant admitted performing these acts.  Moreover, his DNA was found on the victim's chest and his sperm cells were found in her vagina.

The key disputed issue was whether the acts were consensual.  And only one of the victim's statements to Nurse Faugno was even relevant to that issue:  She said that, after she was on the ground:  "[H]e is on top of her, and pushing isn't doing anything.  She can't get him off."  Even if this statement had not been admitted, however, it would have been obvious to the jury that at that point, the victim was at least *claiming* that the sexual acts were not consensual.  After all, she had told the Staigers she had been raped, the police had interviewed her, and — at the very moment when she made the statement — *she was undergoing a sexual assault examination*.

16

It was not inconceivable that the victim engaged in consensual sex with defendant and then decided, for whatever reason, to claim that it was not consensual. Even if so, however, she had to have made that decision before talking to the Staigers. Thus, the fact that she also told Nurse Faugno, hours later, that the sex was not consensual added little, if anything.

We therefore conclude that defendant cannot show prejudice.

III

THE ADMISSION OF THE VICTIM'S STATEMENTS TO DETECTIVE BIGGERS

Defendant contends that the trial court erred by admitting the victim's statements to Detective Biggers under the spontaneous statement exception to the hearsay rule. (Evid. Code, § 1240.)

A.     *Additional Factual and Procedural Background.*

Detective Biggers testified that he took a statement from the victim a little after 10:00 p.m. She was "extremely upset" and "crying." Several times, he had to "pause, and she would break down crying and then [he would] resume the questioning."

Shortly thereafter, there was this colloquy:

"Q. . . . What was the information she provided to you concerning her circumstance?

"A. She said that she was — she had been separated from her friend with whom she had come to the concert with inside the venue, and she decided to leave the venue.

17

Once she got out, she couldn't get back in.  They wouldn't let her back in because it was so close to the end of the concert.

"[DEFENSE COUNSEL]:  Objection.  Narrative and hearsay.

"[PROSECUTOR]:  Excited utterance.  [¶] . . . [¶] . . .

"THE COURT:  Overruled.  She may answer.  Ladies and gentlemen, let me explain this to you.  Hearsay is a statement made other than a witness at the trial outside the courtroom being admitted into the courtroom for the truth of the matter asserted.  Let me put that into English.  What Jaclyn told the officer and he's relaying to you is hearsay because it's an out-of-court statement made by a witness other than at the trial.  She's not here at the moment, but she told the officer something.

"The hearsay issue is riddled with exceptions as you can all imagine.  So many that it may — exceptions may have gobbled up the rule.  And one of the exceptions is excited utterance.  So someone — the reason for the hearsay rule is to determine whether the statement made is credible or not credible.  Is it reasonable?  Is it trustworthy really?  And exceptions are designed if someone is really excited and blurts something out, the law says that that is more — it is trustworthy.

"And so the statement made by Jaclyn to this officer, although hearsay, comes in under the excited utterance section [*sic*; sc. "exception"] to the hearsay rule because she's clearly upset and excited.  So even though it's hearsay, it's admissible.  So I'm going to allow the officer to tell you what Jaclyn told him.  Proceed."

18

Detective Biggers then proceeded to testify to what victim told him. It was essentially consistent with the victim's testimony at trial: She decided to wait by her friend's car but had trouble finding it. She encountered a black male; she thought he was with security, because he was wearing a yellow windbreaker. He seemed nice, helpful, polite, and "charming." He let her use his cell phone to call her friend. She spoke to her friend briefly before losing contact. The wallpaper on the phone was a photo of him.

He also offered to help her find the car. Once they found it, she sat behind it. He suggested that she sit in front of the car, because her friend would be able to see her better. She complied.

She then saw that his pants were unzipped and his genitals were exposed. He forced his penis into her mouth, but she turned away, and it fell out. She told him she was not interested and nothing was going to happen because she had a boyfriend. He then pulled her blouse down, exposing her right breast. He started sucking and biting it. She was "protesting"; she kept trying to push him off her, but could not. Next, he digitally penetrated her. Finally, he undid her belt, pulled her shorts down, and raped her. He was not wearing a condom. She was crying and yelling. When they heard some people coming, he seemed to get scared and ran away. It all happened quickly. "[B]ased on the time," she did not think he ejaculated. She identified an area toward the back of Lot 2 as the place where the rape took place.

19

At one point, defense counsel objected: "Hearsay. At this point, it's a conversation[,] not an excited utterance." The trial court responded: "Overruled. It can come in for the reason indicated."

B.     *Analysis.*

Preliminarily, we note that defense counsel's objections were adequate to preserve defendant's contention. "Once having had this issue resolved against him, defense counsel was not required to repeat his objection . . . . [Citation.] It has long been the rule that '(w)here a party has once formally taken exception to a certain line or character of evidence, he is not required to renew the objection at each recurrence thereafter of the objectionable matter arising at each examination of other witnesses; and his silence will not debar him from having the exception reviewed.' [Citation.]" (*People v. Antick* (1975) 15 Cal.3d 79, 95, disapproved on other grounds in *People v. McCoy* (2001) 25 Cal.4th 1111, 1123.)

"Evidence Code section 1240 provides that '[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement' '[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant' and '[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception.' '[T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief.' [Citation.]

20

'To be admissible, "(1) there must be some occurrence startling enough to produce . . . nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it."' [Citations.] We review the trial court's ruling admitting statements as spontaneous for abuse of discretion. [Citation.]" (*People v. Lynch* (2010) 50 Cal.4th 693, 751-752.) "'"[T]he discretion of the trial court is at its broadest" when it determines whether an utterance was made while the declarant was still in a state of nervous excitement. [Citation.]' [Citation.]" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1271.)

In *People v. Blacksher* (2011) 52 Cal.4th 769, the defendant lived with his mother, Eva. (*Id*. at p. 781.) He was accused of killing his sister and his sister's son, who also lived with Eva. (*Id*. at pp. 780-781.) One Officer Nielsen, who was responding to reports of the shooting, interviewed Eva. (*Id*. at p. 809.) She was "teary eyed, distraught, and very agitated." (*Ibid*.) "Eva spoke first, telling him her daughter and grandson had been shot and were probably dead. . . . Officer Nielsen asked questions . . . . Eva explained that defendant had come into the house earlier and had spoken with her briefly. He then argued with his sister and shot the victims. Eva said she did not see defendant carrying a gun, but assumed he had concealed it. Nielsen asked if defendant was still inside the home. Eva said she did not know, and described the clothing defendant had been

21

wearing. . . . Nielsen spoke with Eva . . . for 10 to 15 minutes. Eva remained upset throughout the conversation. (*Ibid*.)

The Supreme Court held that the trial court properly admitted Eva's statements to the officer under the spontaneous statement exception. (*People v. Blacksher*, *supra*, 52 Cal.4th at pp. 810-811.) It stated: "Defendant does not dispute that Eva was hysterical when she spoke with Officer Nielsen. Under these circumstances the court properly concluded that the statements were made when Eva was under the domination of nervous excitement caused by the event, so that her utterances were spontaneous and unreflecting." (*Id*. at p. 811.)

Here, the trial court could reasonably conclude that the victim was hysterical. Like Eva in *Blacksher*, she was crying, distraught, and agitated. Detective Biggers repeatedly had to pause the interview because she started crying again. He went on to testify that, even at the very end of the interview, when he drove her to the location where, she told him, the crime had occurred, "[s]he just completely broke down, started sobbing and crying." Thus, it was within the trial court's discretion to conclude that she "was under the domination of nervous excitement caused by the event, so that her utterances were spontaneous and unreflecting." (*People v. Blacksher*, *supra*, 52 Cal.4th at p. 811.)

Defendant relies largely on *People v. Ramirez* (2006) 143 Cal.App.4th 1512. There, the victim and a female friend went to a hotel room with the defendant and another man. The victim drank a large quantity of tequila. At 2:00 a.m., defendant and the victim left because the other two wanted to be alone. At 4:30 a.m., defendant and the victim

22

returned to the hotel room.  The victim later claimed that, in the interval, the defendant raped her.  The victim took a shower and came out bleeding; her friend asked her what had happened to her, but she said she did not know.  Between 4:30 and 5:00 a.m., the defendant agreed to drive the victim home.  During the drive, the victim fell asleep.  Around 7:00 a.m., she awoke, in bed, in a strange apartment occupied by a family she did not know.  Sometime after that, she told one of the members of the family in the apartment that she had been raped.  She refused to call her own brother for assistance, saying "My brother is going to kill me."  The victim then walked back to the hotel.  When she got there, around 8:30 or 9:00 a.m., she told a hotel clerk that she had been raped.  He offered to call an ambulance, but she would not let him, saying again that she was afraid of what her brother would do.  (*Id*. at pp. 1518, 1521, 1524.)

On appeal, a majority of the court[8] held that the trial court erred by admitting the victim's statements under the spontaneous statement exception (*People v. Ramirez*, *supra*, 143 Cal.App.4th at pp. 1521-1526), essentially for two reasons.  First, several hours had passed between the rape and the statements.  During this time, the victim had an opportunity to tell her friend she had been raped, but she did not.  Moreover, the victim went to sleep.  (*Id*. at pp. 1524-1525.)  The court conceded that the victim was injured — she had a large bruise on her labia, so that it hurt to walk, and she had unusually profuse bleeding from her hymen (*id*. at pp. 1518, 1520) — but it concluded that these injuries

---

**8**     One justice dissented on this issue.  (*People v. Ramirez*, *supra*, 143 Cal.App.4th at pp. 1532-1537 [conc. opn. of Benke, J.].)

were not so severe as to " . . . inhibit deliberation." (*Id*. at p. 1525.)  Second, the evidence showed that the victim not only could reflect but actually did reflect (*id*. at pp. 1525-1526):  "Although [the victim] was upset and crying when she spoke . . . , she was able to relate in detail the events of the previous evening, and told [listeners] a number of times that she was worried about what her brother might do to her if he were to find out what had occurred the night before." (*Id*. at p. 1525.)

The facts in this case are significantly different from those in *Ramirez*.  Hence, even under the reasoning in *Ramirez*, a different result is required.

First, in this case, the statements were made shortly after the rape.  Based on the calls to Tessa M.'s cell phone, the rape took place between 9:47 and 9:55 p.m.  Detective Biggers testified that he arrived at Lot 2 "[a]round" 10:00 p.m.  An officer already on the scene gave him "a brief explanation of what had happened."  The very next thing he did was speak to the victim.  The trial court could reasonably conclude that the elapsed time was 20 minutes or less.  Indeed, defendant concedes that it was about 20 or 30 minutes.  Moreover, there was no lull or opportunity for reflection comparable to the victim in *Ramirez* taking a shower, falling asleep, or walking back to the hotel.

Second, in this case, there is no indication that the victim did actually reflect on the rape.  Unlike the victim in *Ramirez*, who evidently reflected on the rape at least enough to decide not to tell her friend about it, here Jaclyn immediately told the Staigers that she had been raped.  Also unlike the victim in *Ramirez*, who was worried about what her brother would do, Jaclyn did not discuss the consequences of her disclosure.

24

Defendant also argues that the victim's statements were lengthy and detailed, indicating that they were the product of reflection. In *Ramirez*, however, the court stated: "Contrary to the suggestion in the concurring opinion, it is not merely that [the victim] 'spoke clearly and distinctly, or was oriented to reality' that leads us to conclude that she engaged in a deliberative process, and thus, that the statements at issue do not come within the hearsay exception for spontaneous statements. In addition to these factors, and most important for purposes of our analysis, is the *content* of [the victim]'s statements. . . . [The victim] stated a number of times that she was worried about what her brother would do if he were to find out what had happened to her. These statements demonstrate that [the victim] in fact engaged in a deliberative or reflective process as to the subject matter of the statements at issue . . . ." (*People v. Ramirez, supra*, 143 Cal.App.4th at p. 1526.) As already discussed, Jaclyn made no such statements.

In any event, the mere fact that Jaclyn was able to recount details of what had happened to her does not require a finding that she was able to reflect on it. Detective Biggers indicated that he was questioning her, and she was responding to his questions. Thus, it is not as if she was able to give him an organized, chronological account on her own. In *People v. Poggi* (1988) 45 Cal.3d 306, the Supreme Court upheld the admission of the victim's statements, in response to questioning, that "the perpetrator was a stranger; he came into her home; he had a knife; he took about $90; he beat her up; he raped her in her son's bedroom; he forced her to fill the bathtub, said he was going to drown her, and attempted to do so; they fought in the tub, and he was unsuccessful; he then said, 'I gotta

25

stab you. You gotta die,' and he stabbed her; she first identified her attacker as Black or very dark complected and subsequently answered yes to a question whether he could be Mexican." (*Id*. at p. 316; see also *id*. at pp. 317-320.) Jaclyn's statement was roughly comparable in length and detail.

Defendant argues that the victim was not physically injured. While a physical injury may support a finding that a declarant's statements are spontaneous and unreflective (see *People v. Ramirez*, *supra*, 143 Cal.App.4th at pp. 1524-1525), the *absence* of a physical injury does not require a finding that they are *not*. For example, in *Blacksher*, Eva was not physically injured or in pain, yet her statements were admissible.

Finally, defendant asserts that "if Jaclyn's statements to Detective Biggers could be deemed a spontaneous declaration, almost all interviews of victims by officers could be deemed a spontaneous declaration." We disagree. Not all such interviews take place immediately after the crime; not all such interviews have to be repeatedly interrupted because the victim breaks down crying uncontrollably. If defense counsel had taken Detective Biggers on voir dire, he might have been able to demonstrate that the officer's questions were too suggestive or the victim's answers indicated too much reflection for admissibility. Under *Blacksher*, however, at least *some* interviews of victims by officers are admissible under the spontaneous statement exception. And the facts in this case are not outside the bounds of admissibility as set by *Blacksher*.

Defendant argues — in passing — that the asserted error was exacerbated by the trial court's statement to the jury that the victim's statements were "credible" and

26

"trustworthy." However, because we find no error, we need not consider whether the supposed error was prejudicial. Defendant does not contend that the trial court's remarks were erroneous in themselves. We deem him to have forfeited any such contention.

We therefore conclude that the trial court did not abuse its discretion by admitting Jaclyn's statements to Detective Biggers.

IV

ALLOWING THE PROSECUTION TO ADD CHARGES

OF RAPE OF AN INTOXICATED PERSON AND

SEXUAL PENETRATION OF AN INTOXICATED PERSON

Defendant contends that the trial court erred by allowing the prosecution to amend the information so as to add count 5 (rape of an intoxicated person) and count 6 (sexual penetration of an intoxicated person).

A.      *Additional Factual and Procedural Background.*

1.      *Evidence at the preliminary hearing.*

At the preliminary hearing, Jaclyn testified that she started drinking beer at her hotel, at 1:00 p.m. She also drank beer in the festival parking lot. She had "[p]robably seven" drinks all day. On direct, she said she had her last drink one hour before she left the festival and went out to the parking lot; on cross, however, she said she "misspoke" and she actually had her last drink at 3:00 p.m. As she went out to the parking lot, she was "still buzzed." The rape occurred around 9:30 p.m.

27

2.      *Motion to amend.*

At trial, after all the witnesses had testified, the prosecution moved to amend the information so as to add two counts:  rape of an intoxicated person, and sexual penetration of an intoxicated person.

Defense counsel objected, but not on the ground that the new charges had not been shown at the preliminary hearing.[9]  The trial court granted the motion for leave to amend.

After the jury retired to deliberate, defense counsel advised the court:  "I would like to additionally make the objection that the amended charges . . . were not proved up in the preliminary hearing . . . ."[10]

The trial court commented, "It's pretty thin at the prelim about her alcohol level . . . ."  However, it took no action.  It explained:  "[T]his is all premature.  You've made your records . . . .  [T]his may all go away . . . depending on what the jury verdict is."

The jury then returned its verdicts finding defendant guilty on counts 5 and 6, as well as on count 1 (forcible rape) and count 3 (forcible sexual penetration).

---

[9]      A different deputy public defender had represented defendant at the preliminary hearing.

[10]      Apparently defense counsel first raised this objection in an email to the court.  By the time the trial court heard argument on the issue, the jurors had already reached a verdict.  The email is not in the record, and there is no way to tell whether the jury had reached a verdict when it was sent.

28

Defense counsel filed a written motion to dismiss counts 5 and 6 on the ground that "[t]here was no evidence taken at [the] preliminary hearing to show [them]." At sentencing, the trial court denied the motion.

B. *Analysis.*

This contention presents a difficult question as to whether defense counsel's objection below was timely. It presents an additional difficult question as to whether the evidence at the preliminary hearing was sufficient to show rape of an intoxicated person or sexual penetration of an intoxicated person.

However, there is an alternative — and, we believe, incontrovertible — reason why counts 5 and 6 cannot stand. The evidence at trial showed only one act of sexual intercourse and only one act of sexual penetration. "[O]nly one punishable offense of rape results from a single act of intercourse, though it may be chargeable in separate counts when accomplished under the varying circumstances specified in the subdivisions of section 261 of the Penal Code." (*People v. Craig* (1941) 17 Cal.2d 453, 458.) For example, in *People v. Smith* (2010) 191 Cal.App.4th 199, 205, the court held that the defendant could not be convicted of both rape of an intoxicated person and rape of an unconscious person based on a single act of intercourse. The same reasoning applies equally to sexual penetration.

Here, defendant cannot be convicted on two counts of rape or sexual penetration any more than someone who kills one human being could be convicted on one count of premeditated murder and one count of felony murder. Moreover, no objection was

29

necessary to preserve this issue because it goes to the sufficiency of the evidence to support the duplicative counts. (*People v. McCullough* (2013) 56 Cal.4th 589, 596 ["Parties may generally challenge the sufficiency of the evidence to support a judgment for the first time on appeal . . . ."].)

We will modify the judgment by striking counts 5 and 6. Because the terms on these counts were stayed under Penal Code section 654, there is no change in the total sentence and a remand for resentencing is not required.

V

MULTIPLE CONVICTIONS FOR BOTH

SEXUAL BATTERY AND FORCIBLE SEXUAL PENETRATION

Defendant contends that sexual battery (count 3) is a lesser included offense of forcible sexual penetration (count 4), and hence he could not be convicted of both.[11]

If both convictions were based on defendant's act of digitally penetrating the victim's vagina, we would agree. "A defendant . . . cannot be convicted of both an offense and a lesser offense necessarily included within that offense, based upon his or her commission of the *identical act*. [Citation.]" (*People v. Sanchez* (2001) 24 Cal.4th 983, 987, italics added.) "However, the determination that one offense is necessarily included within another prohibits conviction and punishment for both offenses *only if*

_____

[11] Defendant does not challenge his dual conviction for both simple battery (count 2) and sexual battery (count 4). Thus, we express no opinion on the merit of any such challenge.

30

[the] defendant violated both Penal Code sections by committing *only one act*." (*People v. Alva* (1979) 90 Cal.App.3d 418, 428, italics added.)

In this case, as the prosecutor explained in closing argument, the sexual battery charge was actually based on defendant's act of sucking and biting the victim's breast. Accordingly, multiple convictions were appropriate. Even assuming the jury *could have* based the conviction on the digital penetration, defendant cannot show that it *did*, and thus he cannot show that he was prejudiced.

VI

THE SUFFICIENCY OF THE EVIDENCE OF A "REASONABLE OPPORTUNITY TO REFLECT" FOR PURPOSES OF FULL-TERM CONSECUTIVE SENTENCING

Defendant contends that the trial court erred by finding that count 1 (forcible rape) and count 3 (forcible sexual penetration) were committed on separate occasions, and thus by imposing full-term consecutive sentences on these counts.

A trial court *must* impose full-term consecutive sentences for specified sex crimes — including forcible rape and forcible sexual penetration (Pen. Code, § 667.6, subd. (e)) — "if the crimes . . . involve the same victim on separate occasions." (Pen. Code, § 667.6, subd. (d).)

"In determining whether crimes against a single victim were committed on separate occasions . . . , the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration

31

of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." (Pen. Code, § 667.6, subd. (d).)

We review the trial court's finding of separate occasions under the deferential substantial evidence standard. Under this standard, "we may reverse only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection . . . . [Citation.]" (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092.)

The two cases most closely on point are *People v. King* (2010) 183 Cal.App.4th 1281 and *People v. Pena* (1992) 7 Cal.App.4th 1294.

In *King*, the defendant digitally penetrated the victim. When the lights of a car went by, he removed his finger, looked around, and looked "uneasy." (*People v. King*, *supra*, 183 Cal.App.4th at pp. 1290, 1325.) He then digitally penetrated the victim again. (*Ibid*.) The trial court found that, during the moment when his finger was withdrawn, the defendant not only could but actually did reflect on his actions. (*Id*. at p. 1325.) The appellate court sustained this finding. (*Ibid*.)

In *Pena*, after raping the victim, the defendant got off her, "twisted her by the legs violently," then orally copulated her. (*People v. Pena*, *supra*, 7 Cal.App.4th at p. 1299.) The trial court found that he had a reasonable opportunity to reflect on his actions (*id*. at p. 1313), but the appellate court held that this was error: "[N]othing in the record before this court indicates *any* appreciable interval 'between' the rape and oral copulation. After the rape, appellant simply flipped the victim over and orally copulated her. The assault

here was also continuous.  Appellant simply did not cease his sexually assaultive behavior, and, therefore, could not have 'resumed' sexually assaultive behavior." (*Id*. at p. 1316.)  "Neither does our conclusion change when we consider appellant had to change positions in order to orally copulate [the victim]. . . .  [A] change in positions, alone, is *insufficient* to provide a perpetrator with a reasonable opportunity to reflect upon his actions, especially where the change is accomplished within a matter of seconds."  (*Ibid*.)

Here, according to the victim, defendant put his hand inside her shorts and digitally penetrated her.  He then unfastened her belt, unbuttoned and unzipped her shorts, pulled her shorts down, and penetrated her with his penis.

According to defendant, however, the sequence was reversed.  First, he penetrated the victim with his penis.  When she said, "No, I don't want to," he got up.  He asked her for a kiss, but she said no.  He then digitally penetrated her.

Based on the victim's account, this case is more like *Pena* than *King*.  Defendant did not cease his sexually assaultive behavior, and thus he could not be said to have resumed that behavior.  He simply rearranged his victim's clothing, much as the defendant in *Pena* rearranged his victim.  Unlike in *King*, where the defendant was interrupted by the lights of a car going by, there was nothing that would have caused defendant to have any second thoughts about what he was doing.

Defendant's own account, however, supplies evidence of a reasonable opportunity for reflection. According to defendant, the victim refused to consent to intercourse, so he stopped. Moreover, she even refused to consent to being kissed. Like the lights of the car in *King*, this interrupted defendant's sexually assaultive behavior and gave him a reason to think twice about it. Nevertheless, he determined to resume that behavior.

The trial court could reasonably find defendant's testimony on this point more credible than the victim's. At sentencing, it stated, "She was so drunk she doesn't know what happened." It also stated, "I believe what [defendant] said in the trial was true. . . . I think it happened pretty much as he said it for the most part." And it was entitled to accept defendant's testimony on this point while accepting the victim's testimony on others. (See *People v. Lacefield* (2007) 157 Cal.App.4th 249, 261, disapproved on other grounds in *People v. Smith* (2013) 57 Cal.4th 232, 242.)

We therefore conclude that the trial court properly imposed consecutive sentencing on counts 1 and 3.

## VII

## DISPOSITION

The convictions on counts 5 and 6 and the sentencing terms imposed on counts 5 and 6 are stricken.  The clerk of the superior court is directed to prepare an amended sentencing minute order and an amended abstract of judgment and to forward a certified copy of the amended abstract to the Director of the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.

35