Filed 9/26/16  P. v. Ojeda CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ARMANDO OJEDA, SR.,<br><br>    Defendant and Appellant. | F068784<br><br>(Super. Ct. No. BF150900A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Following a jury trial, appellant Armando Ojeda, Sr. was convicted of making a criminal threat to his now ex-wife (Pen. Code, § 422;[1] count 1); possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3); and possession of ammunition by a felon (§ 30305, subd. (a)(1); count 4). The jury found him not guilty of assault with a firearm (§ 245, subd. (a)(2); count 2), and found it was not true he personally used a firearm in making the criminal threat (§ 12022.5, subd. (a)). In a bifurcated court trial, it was found true appellant had one prior serious felony conviction (§ 667, subd. (a)) and one prior strike conviction (§ 667, subds. (c)-(j)). He was sentenced to an aggregate prison term of nine years.

On appeal, appellant contends the trial court abused its discretion when admitting a 1992 residential burglary conviction as impeachment evidence. He further argues the prosecutor committed misconduct during closing arguments. We find these contentions unpersuasive and affirm.

# FACTUAL BACKGROUND

## I.    Prosecution's Case.

### A.    The altercation with Janie Ojeda.

Janie Ojeda is appellant's ex-wife. She filed for divorce in November 2012 and it was finalized on September 25, 2013. They were married for 17 years. They have no children in common.

On September 23, 2013, Janie's adult son, Marcus, was at Janie and appellant's home in Bakersfield, California. Marcus's minor son was also there. Janie knew that appellant and Marcus did not "get along" because of their past disagreements. Marcus had previously wanted to fight appellant. That night, appellant returned home after work, arriving at approximately 10:15 p.m. Janie met him in the kitchen and she believed he

---

[1]    All future statutory references are to the Penal Code unless otherwise noted.

was in a bad mood based on his responses to her. Appellant was drunk. She testified he was slurring his words and she could smell alcohol on him. They went into the master bedroom where he was going to eat some soup, and he began to undress.

According to Janie, appellant began yelling at her, asking who was in the house. She told him it was Marcus and her little grandson, who were in a separate bedroom. She testified appellant's voice "was filled with rage." He had a "demonic look" and they argued. He asked why Marcus was there and he told Janie to get out of his house. She refused and they argued more. Appellant went to a dresser saying something like: "I told you already, bitch, you and your fucking son better get out of my house right now."

Appellant became upset as he looked through the dresser. Janie asked him what he was looking for, and he said "my fucking gun." She told him it was in the other dresser, and he pulled it out. He said, "Okay. You heard me, bitch. Get the fuck out right now." According to Janie, he put a clip into the gun, chambered a round, put his finger on the trigger, and he pointed the gun at her. He said, "did you hear me bitch? Get the fuck out right now. I'm gonna [*sic*] kill you and your fuckin [*sic*] son. Go get your fuckin [*sic*] son and get the fuck out of my house. I'm gonna [*sic*] kill you, both of you right now." He stood about five to six feet away from her.

Fearing for her life, Janie ran with her cell phone to the next room where her son and grandson were sleeping. She told Marcus that appellant was threatening to shoot them. She left that bedroom and observed appellant in the doorway of the master bedroom. Appellant was pointing the gun towards Marcus's bedroom. She went into an adjoining bathroom and called 911.

Janie spent about four minutes with the 911 operator and she exited the bathroom when the call finished. She saw appellant in the same position by their bedroom. He removed the clip from the gun and cleaned it with a towel. He said, "okay, Janie. I see what you did, you fucking bitch. You think you're gonna [*sic*] call the cops on me. I heard you." He told her it was not over and he again threatened to kill her. Appellant

3.

walked passed her in the hallway and towards the door. She followed him in order to make sure he left the house. Although he continued to threaten her, appellant left the house. She saw him wrap the gun and the clip in the towel, which he threw into his truck. He got into the truck, yelling that it was not over with, and he was going to make her pay for calling the police. He drove away and continued to yell out the window that it was not over, and he would get her for this.

Janie observed appellant drive to a stoplight and turn in the direction of his employer, which was located a block behind their house. A sheriff's deputy arrived at her residence about 30 seconds later. She explained the situation to the deputy, explaining where she thought appellant went, the description of his vehicle, and she gave appellant's cell phone number. When describing the incident, she said appellant had chambered a round in his handgun. After explaining what happened, Janie was advised to spend the night elsewhere.

Janie informed the jury that appellant first possessed the handgun about three weeks before this incident. She testified he obtained it from his friend, Kole Flippo. It was a silver and dark brown gun, and appellant told Janie it was .45-caliber. Appellant had borrowed it for protection after having trouble with a client. About a week and a half after he borrowed it, Janie saw appellant handling the gun in their house. She believed he was cleaning it. On another occasion, about two weeks after borrowing the gun, Flippo was at their house for dinner. Appellant retrieved the gun from a back bedroom and he showed it to Flippo. Janie believed appellant was showing Flippo how he cleaned it. Flippo told appellant to be careful with it because it was registered to him.

**B.    Deputies locate the gun and appellant.**

After appellant drove away, deputies surrounded Downtown Automotive, where appellant's truck was observed parked outside the gated and locked property. A deputy called appellant's cell phone using the number which Janie provided. Appellant answered and spoke with the deputy, who ordered appellant to exit Downtown

Automotive. Appellant said he was not there and he claimed to be in Tulare County. Appellant terminated the phone call. Deputies entered the premises of Downtown Automotive and, after conducting a search, a .45-caliber handgun was located on a grassy area near the shop. The gun had a magazine containing nine rounds, but no round was chambered. At trial, Janie identified the gun recovered at Downtown Automotive as the same gun which appellant used when threatening her.

Janie spent that night at the house of a girlfriend, Teresa Ballaredas. While Janie was there, Ballaredas received three phone calls starting at about 1:00 a.m. During the second call, appellant asked if Ballaredas's son could come pick him up. During the third call, which occurred at approximately 1:40 a.m., appellant left a voice message on Ballaredas's answering machine. He asked to be picked up because the police were "all around" him. After hearing the message, Janie contacted a sheriff's deputy and provided appellant's location. A deputy responded to that location and found appellant at a gas station. Prior to being taken into custody, appellant gave the deputy a false name.

Later that night, appellant told a deputy he and Janie got into an argument about her son Marcus. He said he drove to his place of work and ran from his employer's location because he did not want to get arrested. He denied threatening Janie with a gun and denied possessing a gun that night.

### C. Janie's conversation with Flippo.

After appellant was arrested, Flippo called Janie to talk about the situation. Flippo asked if appellant was found with the gun. Janie said she did not know. The next day, Flippo called her again and reported that the gun had been located. Janie believed Flippo sounded frightened. Based on appellant's statements to her, she believed appellant had told Flippo that he was a convicted felon.

5.

## II.	Defense Evidence.

### A.	Appellant's testimony.

Appellant admitted he had a felony conviction for first degree burglary 21 years before and a felony conviction for petty theft 11 years before. He said he began to have problems with Janie's son Marcus about three years before. Appellant told the jury that Marcus stole from them and used drugs. Appellant did not want Marcus in their house anymore. He told the jury his relationship with Janie worsened after he kicked Marcus out of their home, which is why they argued. He admitted Janie filed for divorce after learning that he was having an affair.

On the day of the incident, appellant worked at Downtown Automotive until 6:00 p.m. During the day appellant learned from Janie's friend that Janie was picking up Marcus and bringing him to their house. Once his shift ended, appellant remained at work until 10:00 p.m. drinking with other employees and friends. He drove home inebriated, agreeing he should not have driven that night. Once home, he made himself soup and spoke with Janie in the kitchen. They went to the master bedroom.

In the master bedroom they began to argue about Marcus. Appellant was upset that Marcus was in their house. He told Janie to take Marcus back to his home and to leave. Appellant testified he decided to leave the house because he knew Janie would not drive Marcus home and he did not want to argue. While he was getting dressed to leave, Janie grabbed her cell phone and went to the restroom. Appellant went into the hallway and Janie came out of the restroom and stood at the door to Marcus's bedroom. Appellant pushed her out of the way, pushing her into the door, because it was a narrow hallway. He said he was leaving, and he walked out of the house. Appellant told the jury he did not know Janie had called law enforcement until he got into his truck and he saw her standing in her nightgown near the road. He testified he did not do anything that night for her to call law enforcement, other than the one push. He drove around the corner to Downtown Automotive. He decided to go there to "blow off the steam" and

6.

avoid any more "fuss" with Janie. He could see sheriff's deputies responding as he drove away.

At Downtown Automotive, appellant parked the truck outside. He denied reentering his place of business. He began running away because he knew he could not get far in his truck because Janie would have given law enforcement its description. He also said he did not want the truck towed because he had expensive tools stored inside it. He did not park the truck inside the shop because he did not have keys to the business.

After running away, appellant saw several sheriff's deputies surrounding the general vicinity. A sheriff's deputy called appellant on his cell phone, telling him he was under arrest for possession of a firearm and making criminal threats. Appellant denied possessing a gun. He told the deputy he was on his way to Tulare County because he did not want to be arrested. He turned off his cell phone and ran to a gas station that was approximately five miles away.

At trial, appellant admitted he lied and gave a false name to the deputy who contacted him at the gas station. He said he lied because he was being sought for spousal abuse and for possessing a gun that he did not have. He told the jury he did not have a gun, he did not point a gun at either Janie or Marcus, and he denied threatening to kill Janie. He said Janie lied during her testimony.

### B. Kole Flippo's testimony.

Flippo is an acquaintance of appellant and had known him for approximately four months starting when appellant began working at Downtown Automotive. Flippo would go by Downtown Automotive and spend time with the employees there, who would often drink beer together after work.

Flippo owned a .45-caliber handgun during the time of this incident. He identified the gun located at Downtown Automotive as his. He denied ever loaning it to either appellant or Janie. He denied knowing that appellant is a convicted felon. About two weeks prior to this incident, Flippo said he was at Janie and appellant's residence with his

handgun, which he put in his truck. He testified that Janie saw him with the gun outside while it was in its holster. He said he never brought the gun into their house.

Flippo said his gun went missing on the night of the incident. He had been at Downtown Automotive after work drinking with some men there. He became drunk and did not realize until he was home that his gun was missing. He learned that sheriff's deputies had located his gun on a grassy area at Downtown Automotive. He testified that the men used that grassy area to urinate when drinking. He testified he urinated 13 or more times that night in that area while carrying the gun in its holster in his pocket. Flippo was uncertain how it happened but at some point the gun ended up on the ground with its holster.

On cross-examination, Flippo said he had learned about appellant's arrest approximately three days after it happened. He knew appellant had been arrested for possessing his gun, and he admitted he never contacted authorities to state he had had the gun with him on the night in question. It was approximately three months later when Flippo made that statement to a defense investigator, who had contacted Flippo to initiate the interview.

## DISCUSSION

I. **The Trial Court Did Not Abuse Its Discretion In Admitting The 1992 Prior Conviction As Impeachment Evidence And Any Presumed Error Was Harmless.**

Appellant contends the admission of his prior 1992 residential burglary conviction as impeachment evidence violated his right to due process and deprived him of a fair trial.

A. **Background.**

1. **The motion in limine.**

Prior to trial, appellant filed a motion in limine seeking to exclude evidence of his prior criminal record. At the hearing, the court noted that appellant had five felony

8.

convictions going back to 1976 that involved moral turpitude, with the most recent occurring in 2002. Defense counsel argued these convictions were too remote in time to be admissible. Subsequent to these crimes, defense counsel acknowledged appellant had suffered a 2007 conviction for driving under the influence (Veh. Code, § 23152, subd. (b)), a 2007 conviction for possession of drug paraphernalia (Health & Saf. Code, § 11364), and a 2008 conviction for possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)). Defense counsel, however, also noted appellant had been crime free for the last five years before trial.

During oral arguments, the prosecutor focused on the two most recent convictions for moral turpitude. The 1992 conviction was for first degree burglary (§ 459) and the 2002 conviction was for petty theft (§ 666) with a prior. Regarding the 1992 conviction, the prosecutor noted appellant was initially sentenced to a Welfare and Institution Code section 3051 narcotic addiction commitment and he was committed to state prison in 1996 for five years and again sent to prison for five years in 2003. The prosecutor asserted this explained the "huge gap" between the prior convictions for moral turpitude. The prosecutor acknowledged that appellant did not have moral turpitude convictions after 2002, but contended appellant had not been able to live a life free of violating the law, except for the last five years.

The court determined that three prior convictions involving moral turpitude, all of which occurred in 1983 or earlier, were too remote to be admissible for purposes of impeachment pursuant to Evidence Code section 352. The court stated the 1992 conviction was also "pretty remote" and it would be inclined to exclude it if it was an isolated incident. However, the court stated it needed to look at the 1992 conviction in a different context and evaluate it "in some respects separately from the first three."

The court stated the 2002 petty theft with a prior was relatively recent in light of appellant's "significant history of criminal activity" and repeated crime. The court believed that "admitting one or two felony convictions for purposes of impeachment is

9.

not such a large number that it would unduly prejudice the jury." The court determined that the probative value of the 2002 conviction outweighed the prejudicial effect and ruled it was admissible for impeachment purposes.

Regarding the 1992 conviction, the court noted it was much more remote in time but it was not similar to the presently charged offenses, and residential burglary was not of such an inflammatory nature to make it unduly prejudicial. The court found that there was not a significant crime free period between the 1992 and 2002 convictions because appellant was not released from parole until "fairly shortly before the 2002 conviction as I understand it." The court believed the two convictions together had significantly more probative value without being too prejudicial. The court stated the 1992 conviction was "a close call" but found on the balance it was admissible for purposes of impeachment pursuant to Evidence Code section 352.

### 2. The relevant jury instructions.

With CALCRIM No. 226, the jury was asked to judge the credibility or believability of the witnesses. They were given factors to consider in evaluating a witness's testimony, including the use of any consistent or inconsistent past statements, whether the witness admitted being untruthful, and whether the witness had been convicted of a felony.

With CALCRIM Nos. 303 and 316, the jury was told that a witness's prior felony conviction could only be used in evaluating the witness's credibility, but the fact of a conviction did not necessarily destroy or impair credibility. The jurors were told it was up to them to decide what weight to give that fact and whether it made the witness less believable.

With CALCRIM No. 362, the jury was instructed that appellant's knowingly false or misleading statements made before trial relating to the pending charges could be used to consider his guilt. The jurors were told they had to decide the meaning and importance if they concluded appellant made such statements.

10.

With CALCRIM No. 372, the jury was instructed appellant's flight could show his consciousness of guilt, and it was up to the jurors to decide the meaning and importance of that conduct.

### 3.    The relevant closing arguments.

The jury was told to find appellant guilty if they believed Janie, but appellant should go free if they believed appellant and Flippo.  The prosecutor said witness credibility was the key issue.

The prosecutor summarized Janie's testimony, highlighting how and why appellant threatened her while holding the handgun, how she called 911, and how appellant fled just before deputies arrived.  At Ballaredas's house that night, appellant left a voice message providing his location, which Janie gave to a deputy.  When approached by a deputy at that location, appellant gave a false name.

The prosecutor argued that appellant's story was ridiculous and made no sense. He noted appellant was taken into custody and never mentioned pushing Janie as a reason for fleeing.  The prosecutor argued appellant would not lie to the deputies over a push. Instead, appellant threatened his wife with a gun as a felon, which explained his subsequent flight.

The prosecutor acknowledged that this case was "his word versus her words." Regarding the prior felony convictions, the prosecutor said they applied in two ways. First, it went to prove counts 3 and 4, which had an element requiring proof that appellant was a felon.  The prosecutor noted that fact was stipulated so the jury did not need to consider it.  The second application reflected appellant's credibility, and the jury could use the two convictions to judge whether he would tell the truth or not.  The jury was asked to review CALCRIM No. 226, and the prosecutor argued appellant lied to law enforcement, he fled from the residence, and he had his felony convictions.

Regarding the discovery of the .45-caliber gun, the prosecutor argued Flippo's testimony was not believable that his loaded gun fell out while he was drinking beer with

11.

his buddies and nobody saw it. He argued Janie's testimony was believable that appellant borrowed the gun several weeks earlier and had it in his possession on the night of the incident. The prosecutor noted that Flippo was motivated to lie because he gave his handgun to a convicted felon and could potentially face legal trouble. The prosecutor opined that appellant parked outside Downtown Automotive and threw the gun over the fence onto the grassy area before he fled on foot from the parked truck.

The prosecutor went through each of the charged offenses, highlighting the elements and how each element was established. The prosecutor contended Janie had no motivation to lie because her divorce from appellant was in the final stages. If she had wanted to gain an advantage, she would have made up allegations earlier in the proceedings. The prosecutor noted Flippo never came forward to authorities to claim he had lost the handgun even though he knew appellant had been arrested for its possession. The prosecutor concluded that appellant "went through a whole bunch of trouble to avoid law enforcement and avoid getting arrested, and all he wants you to believe that he did wrong was push his wife. Folks, that's not a reasonable conclusion." The jury was invited to reject appellant's testimony and find him guilty as charged.

## B.  Standard of review.

"A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 931, fn. omitted.) A trial court enjoys broad discretion to admit or exclude impeachment evidence depending on the factual situation of each case. (*Id.* at p. 932.) The trial court's exercise of discretion is ordinarily upheld on appeal. (*Ibid.*)

## C.  Analysis.

Appellant contends the 1992 conviction was too remote in time, it lacked probative value, and it was highly prejudicial. He argues his residential burglary offense had less probative value to assess his credibility when compared to other felonies, such as

perjury. He relies primarily on *People v. Antick* (1975) 15 Cal.3d 79 (*Antick*), disapproved on other grounds in *People v. McCoy* (2001) 25 Cal.4th 1111, 1123, that his subsequent criminal history did not make the 1992 conviction probative. He asserts reversal is required because the trial court abused its discretion. We disagree, finding no abuse of discretion and no prejudice even when we presume error occurred.

### 1. The trial court did not abuse its discretion.

In order to be admissible for impeachment, past misconduct must involve moral turpitude. (*People v. Edwards* (2013) 57 Cal.4th 658, 722.) In the criminal context, this term has been defined both as a " 'readiness to do evil' " (*People v. Castro* (1985) 38 Cal.3d 301, 314) and " 'a willingness to lie.' [Citations.]" (*People v. Clark, supra,* 52 Cal.4th at p. 932.) Without the use of prior convictions to impeach, a testifying defendant could enjoy "a ' "false aura of veracity." ' [Citations.]" (*People v. Hinton* (2006) 37 Cal.4th 839, 888.)

Beyond the foundational requirement of moral turpitude, a " 'court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify.' [Citation.]" (*People v. Edwards, supra,* 57 Cal.4th at p. 722.)

Burglary is a crime of moral turpitude (*People v. Collins* (1986) 42 Cal.3d 378, 395, fn. omitted), a point which appellant concedes. Although perjury may have a stronger probative value regarding dishonesty than commission of residential burglary, California courts have consistently held that prior burglary convictions are clearly probative on the issue of credibility for purposes of impeachment. (See *People v. Mendoza* (2000) 78 Cal.App.4th 918, 925 [burglary, robbery and vehicle theft]; *People v. Muldrow* (1988) 202 Cal.App.3d 636, 645 [burglary and attempted burglary]; *People v. Hunt* (1985) 169 Cal.App.3d 668, 675 [burglary and auto theft].) The 1992 prior

13.

conviction for residential burglary had some probative value regarding appellant's honesty or veracity.

Although the 1992 conviction could be characterized as remote, convictions remote in time are not automatically inadmissible for purposes of impeachment where a defendant has had recurring legal trouble. (*People v. Edwards, supra,* 57 Cal.4th at p. 722; *People v. Mendoza, supra,* 78 Cal.App.4th at pp. 925-926.) In 1995, appellant was convicted of violating Health and Safety Code section 11550. In 2000, he was convicted of violating Health and Safety Code sections 11550 and 11350. He did not lead a legally blameless life between the 1992 and 2002 convictions. We agree with the trial court that the 1992 conviction was not so remote as to render it inadmissible. Our conclusion is not altered by appellant's reliance on *Antick, supra,* 15 Cal.3d 79.

In *Antick*, the defendant was convicted of murder and burglary, among other charges. (*Antick, supra,* 15 Cal.3d at p. 82.) During trial, impeachment evidence was introduced showing the defendant suffered forgery convictions which were 17 and 19 years old. (*Id.* at p. 99.) *Antick* determined the trial court abused its discretion in permitting the use of this impeachment evidence because the case was close without any direct evidence linking the defendant to the charged offenses. The circumstantial evidence of guilt was "far from overwhelming." (*Id.* at p. 98.) It was highly probable the jury would consider the prior convictions as proof the defendant was willing to participate in unlawful activity and he was likely to have committed the charged crimes. (*Ibid.*) Under the circumstances of the case, the Supreme Court did not believe the trial court's limiting instruction was sufficient to minimize the potential prejudice. (*Ibid.*) Although the defendant had not led a legally blameless life after these convictions, *Antick* determined these prior convictions were too remote in time. (*Id.* at p. 99.) The defendant had a number of ongoing altercations with law enforcement, mainly drug-related offenses, after these prior convictions, which the Supreme Court believed only slightly enhanced the probative value of the evidence for impeachment purposes. (*Ibid.*)

Here, unlike in *Antick*, it is not highly probable this jury considered the 1992 prior conviction as proof that appellant was guilty of the charged crimes. To the contrary, Janie testified appellant fled to Downtown Automotive with Flippo's handgun after he threatened her with it. Appellant agreed he fled briefly to that location, but claimed he had no gun. Flippo's gun was located later that night at Downtown Automotive, and Flippo explained his loaded gun fell from his pocket without his knowledge while he was drunk. Based on the verdicts rendered, the jury believed appellant did not make criminal threats while personally using a firearm (§ 12022.5, subd. (a); count 1) and they found him not guilty of assault with a firearm (§ 245, subd. (a)(2); count 2). The limiting instructions provided to the jury with CALCRIM Nos. 303 and 316 appeared sufficient to minimize any potential prejudice. *Antick* is distinguishable.

We agree with the trial court that the 1992 conviction was not similar to the current charges. There is no risk the jury would have confused the 1992 prior conviction with the current charges. The number of priors admitted against appellant for purpose of impeachment (two) were not numerous. Appellant choose to testify in his own defense and he readily admitted these two priors at the beginning of his testimony.

Balancing the factors, there was sufficient probative value that the 1992 prior outweighed its prejudicial effect, even when combined with the 2002 prior. This record does not demonstrate that the trial court abused its broad discretion in permitting admission of the 1992 prior conviction for residential burglary. Accordingly, reversal is not required. In any event, as we discuss below, we also determine any presumed error was harmless.

### 2. Any presumed error was harmless.

The parties dispute whether we should review prejudice under the state standard of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) or the federal standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). Under the *Watson* standard, we ask whether it is reasonably probable a result more favorable to appellant would have occurred absent

15.

the error. (*Watson, supra,* 46 Cal.2d at p. 836.) Under the *Chapman* standard we ask whether the constitutional error was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24.) We need not resolve this dispute because under either standard any presumed error was harmless.

Appellant contends the 1992 prior conviction minimized his defense because the jurors were unlikely to believe anything he had to say, and the prosecution's case against him was not strong. He argues the prosecutor suggested to the jury during closing arguments that he was a liar and should not be believed. He maintains the 1992 prior ultimately amounted to propensity evidence against him, rendering his trial fundamentally unfair. We disagree.

The jury was instructed that it could use the fact of appellant's prior convictions only to assess his credibility and for no other purpose. "We presume the jury followed the trial court's instructions. [Citation.]" (*People v. Edwards, supra,* 57 Cal.4th at p. 723.)

We cannot say that the prosecution's case against appellant was weak. Appellant fled when Janie called 911, he lied to sheriff's deputies about some of his actions, and he gave a false name. Appellant's actions indicated his consciousness of guilt.

Although the prosecutor mentioned the 1992 prior conviction during closing arguments, it was not emphasized or overly stressed. Instead, the prosecutor focused on how unreasonable appellant's testimony appeared. The prosecutor asked the jury to review CALCRIM No. 226 as a guide to evaluating credibility, arguing appellant lied to law enforcement, he fled from the residence, and he had his felony convictions.

Based on the verdicts rendered, it is apparent the jury believed appellant's testimony that he did not possess a gun when threatening Janie. Based on the totality of this record, any presumed error in admitting the 1992 conviction was harmless. It is beyond a reasonable doubt that the introduction of the 1992 conviction did not contribute to the verdicts rendered. Accordingly, reversal is not required.

**II.     The Prosecutor Did Not Commit Prejudicial Misconduct And Any Presumed Misconduct Was Harmless.**

Appellant asserts the prosecutor committed prejudicial misconduct during closing arguments by shifting the burden of proof to him to prove his innocence.

**A.     Background.**

**1.     Relevant closing arguments.**

During closing arguments, appellant's defense counsel asked the jury to consider why the prosecutor did not play a recording of Janie's 911 telephone call for them to hear. Defense counsel argued the failure to play the 911 call implied she either made a different initial description of the gun and/or she was not scared. Defense counsel asserted the prosecution's actions flipped the burden of proof because it was the prosecutor's burden to bring that evidence forward, which did not happen. Defense counsel also questioned why Marcus did not testify to corroborate the threat which appellant allegedly made, noting the district attorney's office had resources to locate him for trial.

During rebuttal arguments, the prosecutor made the following relevant comments, to which the defense objected:

> "During [defense counsel's] closing argument he made reference to the fact that I didn't put on all the evidence, and of course the jury instructions said I don't have to and, as he said, I'm hiding behind that.

> "But I want [you to] keep in mind, as far as the 911 call goes and as far as Marcus Caraveo [goes], I am statutorily and constitutionally obligated to provide discovery to a defendant in every criminal case, and that's no different here. [Defense counsel] has the 911 call, and he has the same information regarding Marcus Caraveo that I do, and he also elected not to put that evidence on. Make of that what you will.

> "[DEFENSE COUNSEL]: I'm going to object. Burden shifting.

> "THE COURT: The objection is overruled."

17.

### 2. Relevant jury instructions.

With CALCRIM No. 200, the jury was told to follow the law as explained by the court. If the attorneys made comments which conflicted with the law, the jurors were to follow the court's instructions.

With CALCRIM No. 220, the jury was instructed that appellant was presumed innocent and the prosecution had the burden of proof to establish his guilt beyond a reasonable doubt. The jurors were told to find appellant not guilty if the evidence did not prove him guilty beyond a reasonable doubt.

With CALCRIM No. 224, the jury was instructed that the prosecution was required to prove beyond a reasonable doubt each fact essential to a conclusion reached through circumstantial evidence.

With CALCRIM Nos. 300 and 301, the jurors were told neither side was required to call all witnesses who may have information about the case, or to produce all physical evidence that might be relevant. The testimony of a single witness was sufficient to prove any fact.

### B. Standard of review.

Prosecutorial misconduct will result in a reversal under the federal Constitution when the misconduct infects the trial with fundamental unfairness which results in a denial of due process. (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.) Under state law, reversal is required when the prosecutor uses deceptive or reprehensible methods to gain a conviction. (*People v. Cook* (2006) 39 Cal.4th 566, 606.) "To preserve a misconduct claim a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the misconduct claim preserved for review. [Citation.]" (*Ibid.*) When the prosecutorial claim involves the prosecutor's remarks to the jury, we ask whether there is a reasonable likelihood the jury construed or applied the prosecutor's remarks in an objectionable fashion. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.)

18.

### C. Analysis.

Appellant argues the prosecutor's rebuttal argument improperly shifted the burden of proof to him to prove his innocence in violation of his due process right that the charges be proven beyond a reasonable doubt. He claims this was an "extremely close case" making the alleged misconduct prejudicial. He seeks reversal of his convictions. We disagree.

As an initial matter, although defense counsel lodged an objection at trial, there was no request for an admonition to cure any alleged harm. Thus, this claim is forfeited on appeal. (*People v. Montiel* (1993) 5 Cal.4th 877, 914, disapproved on another point in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.) In any event, we also reject this argument on the merits and find any presumed error harmless.

### 1. The prosecutor did not commit misconduct.

A prosecutor may comment on the state of the evidence, or on the failure of the defense to introduce material evidence, including the failure to call witnesses. (*People v. Medina* (1995) 11 Cal.4th 694, 755.) Our Supreme Court has stated it is neither unusual nor improper for a prosecutor to comment on the defense's failure to call logical witnesses. (*People v. Gonzales, supra,* 54 Cal.4th at p. 1275.)

There are situations in which a prosecutor is allowed to make comments in rebuttal that would otherwise be improper, such as when responding to arguments made by defense counsel. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026; *People v. Sandoval* (1992) 4 Cal.4th 155, 193; *People v. McDaniel* (1976) 16 Cal.3d 156, 177; *People v. Hill* (1967) 66 Cal.2d 536, 560.) However, a prosecutor may not state "that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.)

Here, defense counsel first raised the issue of the prosecution not producing Janie's 911 call or calling Marcus to testify at trial. Defense counsel argued this failure constituted burden shifting. The prosecutor's comments in rebuttal merely responded to

the points which defense counsel raised and noted appellant had the same opportunity to produce the disputed evidence. The prosecutor did not state or suggest appellant had the burden to prove his innocence, or a duty or burden to produce this evidence.

This record does not demonstrate a fundamentally unfair trial. The prosecutor did not use deceptive or reprehensible methods to obtain the convictions. There is not a reasonable likelihood the jury construed or applied the prosecutor's remarks in an objectionable fashion. As a result, misconduct is not present and reversal is not required. In any event, we also determine below that any presumed error was harmless.

### 2. The prosecutor's comments were harmless.

Even if we were to conclude the prosecutor committed misconduct with his brief comments, a position we do not take, the prosecutor's comments were harmless beyond a reasonable doubt. The court properly instructed the jury on the appropriate burden of proof. The jurors were told that the court's instructions were to take precedence over any contrary comments by the attorneys. The prosecutor's comments were very brief and were not inflammatory. Based on the verdicts, it appears the jury believed some of appellant's evidence while also believing some of Janie's testimony.

It is beyond a reasonable doubt that the prosecutor's statements did not contribute to the verdicts rendered. Accordingly, reversal is not required.

### DISPOSITION

The judgment is affirmed.

_____
LEVY, Acting P.J.

WE CONCUR:


_____
KANE, J.


_____
DETJEN, J.

20.